## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ED ABREU, JOE BUSTOS, RICHARD GONZALES,
TOM MASCARENAS, MARIE MATEJKA, ALBERT PINO,
ANTONIO SANCHEZ, RICHARD TRUJILLO, and
ROBERT VALENZUELA,

       Plaintiffs,

vs.                                           No. CIV 08-1006 JB/RLP

NEW MEXICO CHILDREN, YOUTH
AND FAMILIES DEPARTMENT (CYFD),
DORIAN DODSON, as an individual and in
her official capacity as Secretary of CYFD,
NEW MEXICO STATE PERSONNEL OFFICE,
and SANDRA PEREZ, as an individual and in
her official capacity as State Personnel Office Director,

       Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendants' Motion for Summary Judgment as to Antonio Sanchez, filed January 31, 2011 (Doc. 49); (ii) the Defendants' Motion for Summary Judgment as to Robert Valenzuela, filed January 31, 2011 (Doc. 50); (iii) the Defendants' Motion for Summary Judgment as to Richard Trujillo, filed January 31, 2011 (Doc. 51); (iv) the Defendants' Motion for Summary Judgment as to Albert Pino, filed January 31, 2011 (Doc. 52); (v) the Defendants' Motion for Summary Judgment as to Tom Mascarenas, filed January 31, 2011 (Doc. 53); (vi) the Defendants' Motion for Summary Judgment as to Joe Bustos, filed January 31, 2011 (Doc. 54); (vii) the Defendants' Motion for Summary Judgment as to Richard Gonzales, filed January 31, 2011 (Doc. 55); and (viii) the Defendants' Motion for Summary Judgment as to Edward Abreu, filed January 31, 2011 (Doc. 56). The Court held a hearing on March 9, 2011. The primary

issues are: (i) whether the Court should enter summary judgment on the Plaintiffs' procedural-due process claims, because the Plaintiffs were not entitled to pre- or post-termination hearings, or because, if the Plaintiffs were entitled to pre- or post-termination hearings, the law is not clearly established; (ii) whether the Court should enter summary judgment on the Plaintiffs' breach-of-contract claims, because the language of the alleged contract is ambiguous, and because there is a genuine issue of fact whether the Defendants breached the contract; and (iii) whether the Court should enter summary judgment on the Plaintiffs' declaratory judgment claims.  The Court will grant in part and deny in part the Defendants' motions.  The Court will grant summary judgment on the Plaintiffs' procedural due-process claims against Defendant Dorian Dodson and Defendant Sandra Perez on the grounds of qualified immunity, because there is no clearly established law requiring pre-termination or post-termination hearings in the context of a reduction in force ("RIF"). The Court will enter declaratory judgment in the Plaintiffs' favor on the Plaintiffs' request for declaratory judgment on the federal law issues regarding their entitlement to pre- and post-termination hearings.  Having disposed of the Plaintiffs' federal claims, the Court remands the Plaintiffs' remaining state-law claims -- their breach-of-contract claims and their request for declaratory relief on state law issues -- to the Eighth Judicial District Court, Colfax County, State of New Mexico.

## FACTUAL BACKGROUND

A decision was made to close the New Mexico Boys School ("the Boys School") near Springer, New Mexico, and it closed.  See Affidavit of Mary-Dale Wilson f/k/a Mary-Dale Bolson ¶ 5, at 2 (sworn to on January 13, 2011), filed January 31, 2011 (Doc. 49-1)("On or about December 2005, I along with the Governor and the Director of the Legislative Council Service, David Abbey,

made the decision to close the NMBS."); Motion as to Sanchez ¶ 1, at 4 (setting forth this fact);[1] Response at 4-8 (not controverting this fact). The decision to close the Boys School was based upon an overabundance of beds available for youth detention across the State of New Mexico. See, e.g., Wilson Aff. ¶ 6, at 2; Motion as to Sanchez ¶ 2, at 4 (setting forth this fact); Response at 4-8 (not controverting this fact). Another reason the Boys School was closed is that it was located in an isolated rural area of the state, and it had become difficult to recruit and retain qualified behavioral and mental health professionals to treat the youth the courts committed to the long-term juvenile justice facility. See, e.g., Affidavit of Dorian Dodson ¶ 7, at 2 (sworn to January 24, 2011), filed January 31, 2011 (Doc. 49-2); Motion as to Sanchez ¶ 3, at 4 (setting forth this fact); Response at 4-8 (not controverting this fact). Today's youth have higher behavioral health and/or mental needs than did youth in the past, which mandated an increased need for behavioral and mental health professionals. See, e.g., Dodson Aff. ¶ 7, at 2; Motion as to Sanchez ¶ 3, at 4 (setting forth this fact); Response at 4-8 (not controverting this fact). In addition, the decision to close the Boys School was based upon the terms of a settlement agreement in another case in which a CYFD entity was a named defendant. See Wilson Aff. ¶ 6, at 2; Motion as to Sanchez ¶ 4, at 5 (setting forth this fact); Response at 4-8 (not controverting this fact). The New Mexico Department of Corrections was to purchase and purchased the Boys School. See Wilson Aff. ¶ 7, at 2; Motion as to Sanchez ¶ 5, at 5 (setting forth this fact); Response at 4-8 (not controverting this fact).

CYFD and the New Mexico State Personnel Office ("SPO") held town hall meetings for each Boys School shift at a Chapel located on Boys School grounds to inform the Boys School's

---

[1] The Defendants filed eight different motions -- each motion was directed at one of the Plaintiffs. The factual allegations in paragraphs one to nineteen of each motion are the same. The Court will therefore cite only to the Motion as to Sanchez when addressing these general allegations.

employees of the closure.  See Wilson Aff. ¶ 8, at 2; Affidavit of Sandra K. Perez ¶ 8, at 2 (sworn to January 27, 2011), filed January 31, 2011 (Doc. 49-3); Motion as to Sanchez ¶ 6, at 5 (setting forth this fact); Response at 4-8 (not controverting this fact).  There were approximately 162 Boys School employees whose positions were being eliminated as a result of the closure and imminent RIF.  See Perez Aff. ¶ 15, at 3; Motion as to Sanchez ¶ 7, at 5 (setting forth this fact); Response at 4-8 (not controverting this fact).  CYFD and SOP engaged in a lengthy effort to assist the former Boys School employees in identifying and applying for alternative employment with the State of New Mexico.  See, e.g., Perez Aff. ¶¶ 9-10, at 2-3; Motion as to Sanchez ¶ 8, at 5 (setting forth this fact); Response at 4-8 (not controverting this fact).  CYFD and SOP held job fairs.  See, e.g., Perez Aff. ¶ 9, at 2-3; Motion as to Sanchez ¶ 9, at 5 (setting forth this fact); Response at 4-8 (not controverting this fact).  The Corrections Department hired some former Boys School employees, provided they passed a lie detector test and met the Correction Department's physical requirements.  See, e.g., Perez Aff. ¶ 9, at 2-3; Motion as to Sanchez ¶ 10, at 5 (setting forth this fact); Response at 4-8 (not controverting this fact).  Some former Boys School employees applied for and obtained positions at a facility in the Springer area know as Area One.  See, e.g. Perez Aff. ¶ 9, at 3; Motion as to Sanchez ¶ 11, at 5 (setting forth this fact); Response at 4-8 (not controverting this fact).  Some former Boys School employees were required to take a reduction in pay at their new jobs, and some were required to relocate; some employees retired.  See, e.g., Perez Aff. ¶ 9, at 2-3; Motion as to Sanchez ¶ 12, at 5 (setting forth this fact); Response at 4-8 (not controverting this fact).  Other state agencies that hired former Boys School employees were Miner's Colfax Medical Center, the New Mexico Department of Transportation, and the New Mexico Department of Health.  See, e.g., Dorian Aff. ¶ 10, at 3; Motion as to Sanchez ¶ 13, at 6 (setting forth this fact); Response at 4-8 (not controverting this fact).

Ultimately Defendant Sandra Perez, the State Personnel Director, drafted a written RIF plan to be presented to the State Personnel Board for its review, its acceptance, modification, or rejection. See, e.g., Perez Aff. ¶ 11, at 3; Motion as to Sanchez ¶ 14, at 6 (setting forth this fact); Response at 4-8 (not controverting this fact). The plan, if accepted, would affect 162 classified positions and eight employees who did not have a job. See, e.g., Perez Aff. ¶ 11, at 3; Motion as to Sanchez ¶ 14, at 6 (setting forth this fact); Response at 4-8 (not controverting this fact). The RIF plan was to be presented to the State Personnel Board at its December 18, 2006 meeting. See, e.g., Perez Aff. ¶ 14, at 3; Motion as to Sanchez ¶ 15, at 6 (setting forth this fact); Response at 4-8 (not controverting this fact). The agenda that was initially posted on December 7, 2006 failed to list the RIF as an item to be considered. See, e.g., Perez Aff. ¶ 12, at 3; Motion as to Sanchez ¶ 16, at 6 (setting forth this fact); Response at 4-8 (not controverting this fact). The agenda was revised on December 15, 2006 to include the RIF. See, e.g., Perez Aff. ¶ 13, at 3; Motion as to Sanchez ¶ 17, at 6 (setting forth this fact); Response at 4-8 (not controverting this fact). At its December 18, 2006 meeting, the State Personnel Board adopted the RIF by unanimous voice vote. See, e.g., Perez Aff. ¶ 14, at 3; Motion as to Sanchez ¶ 18, at 6 (setting forth this fact); Response at 4-8 (not controverting this fact). The eight employees were given letters notifying them that their positions no longer existed and informing them of their rights, which included six months of re-employment rights under the State Personnel Board Rules and the Personnel Act, NMSA 1978, §§ 10-9-1 to -25. See, e.g., Perez Aff. ¶¶ 15-16, at 3; Motion as to Sanchez ¶ 19, at 6 (setting forth this fact); Response at 4-8 (not controverting this fact).

1. **Plaintiff Antonio Sanchez.**

Sanchez is a Plaintiff in this case. See, e.g., Complaint for Violation of Civil Rights with Alternative Petition for Declaratory and Injunctive Relief at 1, filed October 28, 2008 (Doc. 1-

2)("Complaint"); Motion as to Sanchez ¶ 20, at 6 (setting forth this fact); Response at 7 (not controverting this fact).  His position at the NMBS was subject to the RIF.  See, e.g., Complaint ¶ 22, at 6; Deposition of Antonio Sanchez at 50:22-25 (take September 8, 2010), filed January 31, 2011 (Doc. 49-4); Motion as to Sanchez ¶ 21, at 6 (setting forth this fact); Response at 7 (not controverting this fact).  Sanchez was offered a position at Miner's Colfax Medical Center, accepted the position, and resigned from CYFD.  See, e.g., Sanchez Depo. at 62:20-63:17; Motion as to Sanchez ¶ 22, at 7 (setting forth this fact); Response at 7 (not controverting this fact).  Sanchez then rejected that job offer because it did not provide him the same salary that he was receiving at the Boys School.  See, e.g., Sanchez Depo. at 63:18-64:8; Motion as to Sanchez ¶ 23, at 7 (setting forth this fact); Response at 7 (not controverting this fact).  Sanchez was also offered a job with the Department of Health in Las Vegas, New Mexico, but rejected it because it was too far away and would be too expensive to go to work.  See, e.g., Sanchez Depo. at 65:17-25; Motion as to Sanchez ¶ 24, at 7 (setting forth this fact); Response at 7 (not controverting this fact).  Sanchez does not have any evidence that the fact that his position at the Boys School was subject to the RIF was as a result of retaliation or that the RIF was a pretext for some other reason.[2]  See Sanchez Depo. at 38:20-22,

---

[2] The Defendants assert that Sanchez "does not have any evidence that the fact that his position at the NMBS was subject to the RIF was as a result of retaliation or that the RIF was just a pretext."  Motion as to Sanchez ¶ 25, at 7 (citing Sanchez Depo. at 38:20-22; Sanchez Depo. at 61:20-62:1).  Sanchez disputes this fact, stating that it is not supported by the evidence cited, including "Statements of Fact Nos. 1-24."  Response at 7.  In his deposition, Sanchez testified: "Q. Do you have any evidence that they were trying to retaliate against you?  A.  No, I couldn't tell you that."  Sanchez Depo. at 38:20-22.  He testified:

Q.  How about do you have any facts or information to show that this reduction in force was just a pretext?  And by that I mean, do you have any information that would show that they didn't -- that really the reason the reduction in force was occurring was not for the reasons that the Boys School was disclosing?

A.  I couldn't recall.  I can't answer that.

61:20-62:1 ("Q.  Do you have any evidence that they were trying to retaliate against you?  A.  No, I couldn't tell you that.").  Sanchez does not believe that the Plaintiffs were singled out or targeted for the RIF.[3]  See Sanchez Depo. at 59:25-60:9 ("Q.  Did you ever get the impression or have any

_____

Sanchez Depo. at 61:20-62: 1.  D.N.M.LR-Civ. 56.1(b) states:

> The memorandum in support of the motion must initially set out a concise statement of all material facts as to which movant contends no genuine issue exists.  The facts must be numbered and must refer with particularity to those portions of the record upon which movant relies.
>
> A memorandum in opposition to the motion must contain a concise statement of the material facts as to which the party contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the opposing party relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  Because the evidence supports the asserted fact, and because Sanchez has not directed the Court's attention to evidence specifically controverting the asserted fact, the Court will deem the asserted fact admitted.  See D.N.M.LR-Civ. 56.1(b).

    [3] The Defendants assert that Sanchez "does not believe that the Plaintiffs were singled out or targeted for the RIF."  Motion as to Sanchez ¶ 26, at 7 (citing Sanchez Depo. at 59:25-60:9).  Sanchez disputes this fact, arguing that the asserted fact is "not supported by the evidence cited, including Statements of Fact Nos. 1-24."  Response at 7.  In his deposition, Sanchez testified:

> Q.  Did you ever get the impression or have any facts that would lead you to believe that the plaintiffs in this case were being singled out?
>
> A. No, sir.
>
> Q.  So do you think that anyone at the State of New Mexico, either the Secretary or the State Personnel Officer or even the Governor, was targeting you?
>
> A.  No.  They -- I couldn't tell you because they shut it down.  They weren't picking out who they were going to let go.  They just did it.  I couldn't tell you.

Sanchez Depo. at 59:25-60:9.  Because the evidence supports the Defendants' asserted fact, and because Sanchez has not directed the Court's attention to evidence specifically controverting the asserted fact, the Court will deem the asserted fact admitted.  See D.N.M.LR-Civ. 56.1(b).

facts that would lead you to believe that the plaintiffs in this case were being singled out?  A. No, sir.  Q.  So do you think that anyone at the State of New Mexico . . . was targeting you?  A.  No.").  Sanchez was separated from his employment, as his position no longer existed pursuant to 1.7.10.9 NMAC.  See, e.g., Perez Aff. ¶ 17, at 4; Motion as to Sanchez ¶ 27, at 7 (setting forth this fact); Response at 7 (not controverting this fact).  Sanchez was not separated from his employment based on work performance.[4]  See Perez Aff. ¶ 18, at 4.

## 2.   **Plaintiff Robert Valenzuela.**

Valenzuela is a Plaintiff in this case.  See, e.g., Complaint at 1; Motion for Summary Judgment as to Robert Valenzuela ¶ 20, at 6, filed January 31, 2011 (Doc. 50)("Motion as to Valenzuela")(setting forth this fact); Response at 7 (not controverting this fact).  His position at the Boys School was subject to the RIF.  See, e.g., Complaint ¶ 22, at 6; Motion as to Valenzuela ¶ 21,

---

[4] The Defendants assert:

These 8 employees, including . . . Sanchez, were not separated from their employment based on work performance.  As such, the State Personnel Rules relating to terminations for just cause were not implicated which included written notice of contemplated action, a response thereto, a notice of contemplated action and a right to appeal the decision.

Motion as to Sanchez ¶ 28, at 7 (citing Perez Aff. ¶ 18, at 4).  Sanchez disputes this asserted fact, stating that the asserted fact "is a legal opinion subject to argument, as addressed more fully in the Argument section."  Response at 7.  The assertion that Sanchez was not separated from his employment based on work performance is an assertion of fact and not a legal opinion.  Because Sanchez has not directed the Court's attention to evidence in the record controverting this asserted fact, the Court will deem this asserted fact admitted.  See D.N.M.LR-Civ. 56.1(b).  Because the application of rules which set forth due-process procedures is a legal argument, the Court will not accept this portion of the assertion as a true factual statement, but will address whether Sanchez was entitled to due process procedures in its legal analysis.  See Ruiz v. City of Brush, 2006 WL 1816454, at *4 (D.Colo.2006)("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute[;] [l]egal argument should be reserved for separate portions of the brief.'")(citation omitted).

at 6 (setting forth this fact); Response at 7 (not controverting this fact).  Valenzuela states that he

did not apply for any jobs because he had a job with the Boys School.  See, e.g., Deposition of

Robert Edward Valenzuela at 37:14-24, 38:5-16, 40:21-41:2 (taken September 10, 2010), filed

January 31, 2011 (Doc. 50-4); Motion as to Valenzuela ¶ 22, at 7 (setting forth this fact); Response

at 7 (not controverting this fact).  Valenzuela never had the sense during the process that anyone was

retaliating against him.  See, e.g., Valenzuela Depo. at 56:9-12; Motion as to Valenzuela ¶ 23, at 7

(setting forth this fact); Response at 7 (not controverting this fact).  Valenzuela has no reason to

believe that Defendant Dorian Dodson, Perez, or anyone else at the state was trying to terminate or

target him.  See, e.g., Valenzuela Depo. at 56:13-23; Motion as to Valenzuela ¶ 24, at 7 (setting forth

this fact); Response at 7 (not controverting this fact).  Valenzuela was separated from his

employment, as his position no longer existed pursuant to 1.7.10.9 NMAC.  See, e.g., Perez Aff.

¶ 17, at 4; Motion as to Valenzuela ¶ 24, at 7 (setting forth this fact); Response at 7 (not

controverting this fact).  Valenzuela was not separated from his employment based on work

p e r f o r m a n c e ,   b u t   t h e r e   i s   e v i d e n c e   t h a t   h i s

separation was because of his lack of a high school diploma.[5]  See Perez Aff. 18, at 4;

_____

[5] The Defendants assert:

> These 8 employees, including . . . Valenzuela, were not separated from their
> employment based on work performance.  As such the State Personnel Rules relating
> to terminations for just cause were not implicated which included written notice of
> contemplated action, a response thereto, a notice of contemplated action and a right
> to appeal the decision.

Motion as to Valenzuela ¶ 26, at 7 (citing Perez Aff. 18, at 4).  Valenzuela disputes this asserted fact,
stating that the assertion

> is a legal opinion subject to argument as addressed more fully in the Argument
> section below.  Further the evidence with respect to this Plaintiff is that he was
> specifically targeted for separation.  After successfully completing nearly seventeen

years of employment as a Juvenile Correctional Officer, . . . Valenzuela was told that he was not qualified to continue as a Juvenile Correctional Officer because he lacked a high school diploma. . . . Valenzuela was not allowed to apply for employment at Area 1.

Response at 7-8 (citing Memorandum from Marcy Ojinaga, SPO HR Manager to State Personnel Board (dated December 14, 2006), filed February 22, 2011 (Doc. 58-1)("Valenzuela Memorandum")).

The Valenzuela Memorandum states: "Valenzuela, Robert: 1. Corrs -- not accepted; 2. Area 1 -- no GED; 3. DOH -- no offer $ and no GED." Memorandum at 7. The Defendants argue that the Plaintiffs' Exhibits 1, 3, 4, 5, 6, and 7 cannot generate any factual disputes, because the exhibits "are not supported by affidavits and consist largely of unauthenticated documents that do not fall within the category of 'pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits.'" Motion as to Valenzuela at 3 (quoting Fed. R. Civ. P. 56). The Defendants appear to contest only the authenticity of the exhibits; they do not raise hearsay arguments or other substantive arguments. Their objection appears to be only technical.

The current text of Rule 56 states:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . .

Fed. R. Civ. P. 56(c)(1). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Although the Defendants make much of the fact that affidavits do not support the Plaintiffs' exhibits, the United States Court of Appeals for the Tenth Circuit has stated: "We do not require an affidavit to authenticate every document submitted for consideration at summary judgment." Law Co., Inc. v. Mohawk Const. & Supply Co., Inc., 577 F.3d 1164, 1170 (10th Cir. 2009). As the Tenth Circuit has stated:

Because evidence must be admissible to be considered on summary judgment, the proper inquiry here is under Federal Rule of Evidence 901: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

Law Co., Inc. v. Mohawk Const. & Supply Co., Inc., 577 F.3d at 1170 (quoting Fed. R. Evid. 901(a)). Rule 901 provides several illustrations of authentication or identification conforming to the rule's requirements, including: "**Distinctive characteristics and the like.** Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances," and "**Public records or reports.** Evidence that a writing authorized by law to be

recorded or filed and in fact recorded or filed . . . , or a purported public record, report, statement, or data compilation, in any form, is from the public office where items of this nature are kept." Fed. R. Evid. 901(b)(4), (7). The Valenzuela Memorandum is on the letterhead of the New Mexico State Personnel Board; it is dated and lists the recipient and sender. The attachments to the Valenzuela Memorandum contain headings such as "NMBS Workforce Transition Employee Status Report," which are consistent with the content and substance of the Memorandum, which is "Reduction in Force -- CYFD's New Mexico Boy's School." The Court believes that the appearance, contents and substance of the Valenzuela Memorandum and its attachments sufficiently support a finding that the matter is what the Plaintiffs contend it is.

This finding is in accord with the Court's discussion in <u>Bhandari v. VHA Sw. Cmty. Health Corp.</u>, No. CIV 09–0932 JB/GBW, 2011 WL 1336512, at *4 n.2 (D.N.M. Mar. 30, 2011)(Browning, J.), where the Court found that there was sufficient circumstantial evidence to support the documents' authenticity and that they were thus admissible evidence for summary judgment. This finding is, however, at tension with its earlier Memorandum Opinion and Order in <u>Levin v. Airgas Sw., Inc.</u>, No. CIV 05-629 JB/WDS, 2006 WL 1305040 (D.N.M. Apr. 30, 2006), which the Court decided before the Tenth Circuit issued its opinion in <u>Law Co., Inc. v. Mohawk Const. & Supply Co., Inc.</u> In <u>Levin v. Airgas Southwest, Inc.</u>, the Court stated that the documents the plaintiff set forth in response to the defendant's motion for summary judgment were not authenticated by and attached to an affidavit that "meets the requirements of Rule 56(e) and that it did not fall into one of the types of self-authenticating documents in rule 902." 2006 WL 1305040, at *14. Rule 56 now states:

**(c) Procedures.**

> **(1) Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> **(2) Objection That a Fact Is Not Supported by Admissible Evidence.** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

. . . .

_____

**(e) Failing to Properly Support or Address a Fact.** If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

> **(1)** give an opportunity to properly support or address the fact;
>
> **(2)** consider the fact undisputed for purposes of the motion;
>
> **(3)** grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or
>
> **(4)** issue any other appropriate order.

Fed. R. Civ. P. 56.  In 2006, rule 56 stated:

> **(c) Motions and Proceedings Thereon.**  The motion shall be served at least 10 days before the time fixed for the hearing. . . .  The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
>
> . . . .
>
> **(e) Form of Affidavits; Further Testimony; Defense Required.** . . .  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56.  The Court need not decide in this opinion whether <u>Levin v. Airgas Sw., Inc.</u> was rightly decided, because no one mentioned that in the briefing or at the hearing, so the Court is without briefing; it is sufficient to note that the Court's opinion in <u>Levin v. Airgas Sw., Inc.</u> was not based on the current language of the rule and the current Tenth Circuit precedent and that the Court may not follow that reasoning in this case or in future cases.

The Valenzuela Memorandum does not controvert the Defendants' assertion that Valenzuela was not separated from his employment based on his work performance.  Because Valenzuela has not directed the Court's attention to evidence specifically controverting the Defendants' asserted fact, the Court will deem the Defendants' asserted fact admitted.  <u>See</u> D.N.M.LR-Civ. 56.1(b).  The Memorandum is evidence, however, that Valenzuela's failure to be hired by other agencies, and thus separation was based, at least in part, on his lack of a high school diploma.  Because the Court must construe the evidence in the light most favorable to the non-moving party, the Court will also accept as true Valenzuela's version of the asserted fact -- that his separation was a result, at least in part,

-12-

Memorandum from Marcy Ojinaga, SPO HR Manager to State Personnel Board (dated December 14, 2006), filed February 22, 2011 (Doc. 58-1).

      **3.**     **<u>Plaintiff Richard Trujillo.</u>**

      Trujillo is a Plaintiff in this case. <u>See, e.g.</u>, Complaint at 1; Motion for Summary Judgment as to Richard Trujillo ¶ 20, at 6, filed January 31, 2011 (Doc. 51)("Motion as to Trujillo")(setting forth this fact), Response at 7 (not controverting this fact). His position at the Boys School was subject to the RIF. <u>See, e.g.</u>, Complaint ¶ 22, at 6; Motion as to Trujillo ¶ 21, at 6 (setting forth this fact); Response at 7 (not controverting this fact). At the time of the closure, he had not applied for other jobs. <u>See, e.g.</u>, Deposition of Richard Trujillo at 25:13-15 (taken September 14, 2010), filed January 31, 2011 (Doc. 51-4); Motion as to Trujillo ¶ 22, at 6 (setting forth this fact); Response at 7 (not controverting this fact). Trujillo did not think there would be a job for him once the Boys School closed. <u>See, e.g.</u>, Trujillo Depo. at 25:16-20; Motion as to Trujillo ¶ 23, at 7 (setting forth this fact); Response at 7 (not controverting this fact). Trujillo does not believe that either Perez or Dodson had any animosity towards him or retaliated against him. <u>See, e.g.</u>, Trujillo Depo. at 28:3-29:6; Motion as to Trujillo ¶ 24, at 7 (setting forth this fact); Response at 7 (not controverting this fact). Trujillo was separated from his employment, as his position no longer existed pursuant to 1.7.10.9 NMAC. <u>See, e.g.</u>, Perez Aff. ¶ 17, at 4; Motion as to Trujillo ¶ 25, at 7 (setting forth this fact); Response at 7 (not controverting this fact). Trujillo was not separated from his employment

---

because of his lack of a high school diploma. <u>See</u> <u>Hunt v. Cromartie</u>, 526 U.S. 541, 551 (1999) (stating that the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party). Because the application of rules which set forth due-process procedures is a legal argument, the Court will not accept this portion of the assertion as a true factual statement, but will address whether Valenzuela was entitled to due-process procedures in its legal analysis. <u>See</u> <u>Ruiz v. City of Brush</u>, 2006 WL 1816454, at *4.

based on work performance.[6]  See Perez Aff. 18, at 4.

### 4.    **Plaintiff Albert Pino.**

Pino is a Plaintiff in this case.  See, e.g., Complaint at 1; Motion for Summary Judgment as

to Albert Pino, filed January 31, 2011 (Doc. 52)("Motion as to Pino")(setting forth this fact);

Response at 6 (not controverting this fact).  His position at the Boys School was subject to the RIF.

See, e.g., Complaint ¶ 22,at 6; Motion as to Pino ¶ 21, at 6 (setting forth this fact); Response at 6

(not controverting this fact).  There is some evidence that Pino was retaliated against, because he

was separated from his employment after he returned to work following the Eighth Judicial District

Court's conclusion that his discharge in 2003 was arbitrary and capricious, and contrary to law.[7]

---

[6] The Defendants assert:

> These 8 employees, including . . . Trujillo, were not separated from their
> employment based on work performance.  As such the State Personnel Rules relating
> to terminations for just cause were not implicated which included written notice of
> contemplated action, a response thereto, a notice of contemplated action and a right
> to appeal the decision.

Motion as to Trujillo ¶ 26, at 7 (citing Perez Aff. 18, at 4).  Trujillo disputes this asserted fact,
stating that the asserted fact "is a legal opinion subject to argument as addressed more fully in the
Argument section."  Response at 7.  The assertion that Trujillo was not separated from his
employment based on work performance is an assertion of fact, and is not a legal opinion.  Because
Trujillo has not directed the Court's attention to evidence in the record controverting this asserted
fact, the Court will deem this asserted fact admitted.  See D.N.M.LR-Civ. 56.1(b).  Because the
application of rules which set forth due-process procedures is a legal argument, the Court will not
accept this portion of the assertion as a true factual statement, but will address whether Trujillo was
entitled to due-process procedures in its legal analysis.  See Ruiz v. City of Brush, 2006 WL
1816454, at *4.

[7] The Defendants assert that Pino "has no evidence that he was retaliated against."  Motion
as to Pino ¶ 22, at 6 (citing Pino Depo, at 65:11-17).  Pino disputes this asserted fact.

> Plaintiff asserts that his separation was retaliatory and disciplinary in nature contrary
> to Statement of Fact No. 22.  The evidence in this case demonstrates that Plaintiff
> Pino was terminated from employment in August 2003 based upon allegations of
> misconduct by CYFD.  Pino disputed the allegations of misconduct and requested

an appeal before the State Personnel Board.  The State Personnel Board upheld Pino's termination.  Pino thereafter took appeal to the First Judicial District Court in Santa Fe, New Mexico as allowed under the State Personnel Act.  In July 2006, three years after his termination by CYFD, the First [sic] Judicial District Court concluded that Pino's discharge in 2003 was arbitrary and capricious and contrary to law.  The court thereafter entered its order that Pino should be reinstated to his employment with full back wages and benefits.  CYFD determined it would not undertake further appeal and in August 2006, Pino returned to his employment at NMBS. (Exhibit 7) Pino was then advised that the closure of NMBS was anticipated, and that he should apply for employment outside of CYFD.  Pino requested an opportunity to apply for employment at Area 1, but was told that all vacancies at Area 1 had been filled.  See Exhibit 8.  This evidence would support Pino's contention that he was specifically targeted for the reduction of force because of his history of litigation with Department CYFD.

Response at 6-7.

On July 3, 2006, the New Mexico District Court for the Eighth Judicial District reversed the State Personnel Board's decision, finding that the Board's findings related to the appropriateness of discharge based on Pino's misconduct were arbitrary and capricious.  See Decision and Order at 1, filed February 22, 2011 (Doc. 58-7).  The court remanded the matter to the Board with instructions to reinstate Pino to his employment.  See Decision and Order at 2.  Meeting notes from the Boys School update with CYFD, the Corrections Department, and the SPO from August 8, 2006 state that Pino

was notified of a CO opening and the agency is awaiting his decision.  CYFD will have . . . Pino create an Assessment Sheet; inform him that Area 1 is closed and he has no opportunity to apply there; he had opportunity to apply for jobs while off work and he didn't.  CYFD will assess his skills/qualifications, if an opening occurs at Area 1 he can apply and if an opening occurs at NMCD he can apply.

Meeting -- NMBS update with CYFD, NMCD, and SPO (dated August 8, 2006), filed February 22, 2011 (Doc. 58-8)("Meeting Minutes").  The Defendants assert that, because these exhibits are not supported by affidavits, they cannot create factual disputes.  The Defendants make only a technical objection, based on the exhibits not being authenticated; they do not make any hearsay or other substantive objections.  Exhibit 7 is a published Decision and Order, complete with a stamp showing when it was filed.  This document was filed as a public record, and there is sufficient evidence to support a finding that the document is what Pino contends it is.  Exhibit 8 are notes taken at a meeting.  The Court believes that the contents and substance of the notes, which include the date of the meeting, the events of the meeting, and a list of who was in attendance at the meeting are sufficient evidence to support a finding that the matter is what Pino asserts it is.

These exhibits are evidence that Pino was separated from his employment soon after he was reinstated following a ruling from a district court and that he did not have the opportunity to apply for jobs at Area 1 after his reinstatement.  Given the timing of the events, the Court believes there

-15-

See Deposition of Albert Lee Pino at 65:11-17 (taken September 10, 2010), filed January 31, 2011 (Doc. 52-4).  Pino was separated from his employment, as his position no longer existed pursuant to 1.7.10.9 NMAC.  See, e.g., Perez Aff. ¶ 17, at 4; Motion as to Pino ¶ 23, at 7 (setting forth this fact); Response at 6 (not controverting this fact).  Pino was not separated from his employment based on work performance, but there is evidence that he was the target of retaliation in his separation.[8]  See Perez Aff. 18, at 4; Decision and Order at 1-2; Meeting Minutes at 1.

   **5.      Plaintiff Tom Mascarenas.**

       Mascarenas is a Plaintiff in this case.  See, e.g., Complaint at 1; Motion for Summary Judgement as to Tom Mascarenas, filed January 31, 2011 (Doc. 53)(setting forth this fact)("Motion

---

may be a factual issue whether Pino was retaliated against.  Because the Court must construe the evidence in the light most favorable to the non-moving party, the Court will accept as true Pino's version of the asserted fact -- that there is evidence Pino was retaliated against.  See Hunt v. Cromartie, 526 U.S. at 551.

       [8] The Defendants assert that:

       These 8 employees, including . . . Pino, were not separated from their employment based on work performance.  As such the State Personnel Rules relating to terminations for just cause were not implicated which included written notice of contemplated action, a response thereto, a notice of contemplated action and a right to appeal the decision.

Motion as to Pino ¶ 24, at 7 (citing Perez Aff. 18, at 4).  Pino disputes this assertion, stating "that statement is an opinion subject to argument, as addressed more fully in the Argument section which follows."  Response at 6.  The assertion that Pino was not separated from his employment based on work performance is an assertion of fact, and is not a legal opinion.  Because Pino has not directed the Court's attention to evidence specifically controverting the Defendants' asserted fact that Pino was not separated from his employment based on work performance, the Court will deem the Defendants' asserted fact admitted.  See D.N.M.LR-Civ. 56.1(b).  Taking the evidence in the light most favorable to Pino, however, there is evidence that Pino was the target of retaliation, and the Court will thus accept as true Pino's version of this fact -- that he the target of retaliation in his separation.  See Hunt v. Cromartie, 526 U.S. at 551.  Because the application of rules which set forth due-process procedures is a legal argument, the Court will not accept this portion of the assertion as a true factual statement, but will address whether Trujillo was entitled to due-process procedures in its legal analysis.  See Ruiz v. City of Brush, 2006 WL 1816454, at *4.

as to Mascarenas"); Response at 5 (not controverting this fact).  His position at the Boys School was

subject to the RIF.  See, e.g., Complaint ¶ 22, at 6; Motion as to Mascarenas ¶ 21, at 6 (setting forth

this fact); Response at 5 (not controverting this fact).  Mascarenas was offered and accepted a

position at the Department of Health in Las Vegas.[9]  See Deposition of Tom Mascarenas at 14:6-18

(taken September 10, 2010), filed January 31, 2011 (Doc. 53-4).  Mascarenas resigned from that job

after eight months.[10]  See Mascarenas Depo. at 40:14-19.  Mascarenas believes that the decision to

---

[9] The Defendants assert that Mascarenas "was offered and accepted a position at the Department of Health in Las Vegas, New Mexico."  Motion as to Mascarenas ¶ 22, at 6 (citing Mascarenas Depo. at 14:6-18).  Mascarenas disputes the materiality of this asserted fact, stating that "his employment with the Department of Health commenced after he was terminated through the reduction in force at issue, although [his] post termination employment may become relevant to damage issues."  Response at 5.  In his deposition, Mascarenas stated:

> Q.  Who did these two people work for?
>
> A.  They worked for CYFD.  Human Resources, maybe, I'm not sure who they worked for, but they questioned me about what had taken place.  And they just told me, "Well, if we come up with something, we'll let you know."  Nothing ever came about.
>         So December 26, when they decided to close it that day, or that was our last day, then the following day, on the 27th, I went back to the Boys School to talk to Connie Chavez about my options, you know.  And that's when I decided to go ahead and take the job for the Department of Health.
>
> Q.  Was that in Las Vegas?
>
> A.  Yes.

Mascarenas Depo. at 14:6-19.  This evidence does not controvert the Defendants' asserted fact. Because Mascarenas has not directed the Court's attention to evidence controverting the Defendants' asserted fact, the Court will deem the Defendants' asserted fact admitted.  See D.N.M.LR-Civ. 56.1(b).

[10] The Defendants assert that Mascarenas "resigned from that job after eight months." Motion as to Mascarenas ¶ 23, at 7 (citing Mascarenas Depo. at 40:14-19).  Mascarenas disputes the materiality of this asserted fact, stating that "his employment with the Department of Health commenced after he was terminated through the reduction in force at issue, although [his] post termination employment may become relevant to damage issues."  Response at 5.  Because

close down the Boys School was based on economic considerations.  See, e.g., Mascarenas Depo. at 28:1-17, 50:20-51:15; Motion as to Mascarenas ¶ 24, at 7 (setting forth this fact); Response at 5 (not controverting this fact).  Mascarenas does not feel that the fact that his position at the Boys School was subject to the RIF was as a result of retaliation for speaking out against its closure.  See, e.g., Mascarenas Depo. at 45:11-46:1; Motion as to Mascarenas ¶ 25, at 7 (setting forth this fact); Response at 5 (not controverting this fact).  Mascarenas was separated from his employment, as his position no longer existed pursuant to  1.7.10.9 NMAC.  See, e.g., Perez Aff. ¶ 17, at 4; Motion as to Mascarenas ¶ 26, at 7 (setting forth this fact); Response at 5 (not controverting this fact).  Mascarenas  was  separated  from  his  employment  because  of  disciplinary  reasons.[11]

_____

Mascarenas has not directed the Court's attention to evidence controverting the Defendants' asserted fact, the Court will deem the Defendants' asserted fact admitted, see D.N.M.LR-Civ. 56.1(b), and address the materiality of the fact in its legal analysis.

   [11] The Defendants assert:

   These 8 employees, including . . . Mascarenas, were not separated from their employment based on work performance.  As such the State Personnel Rules relating to terminations for just cause were not implicated which included written notice of contemplated action, a response thereto, a notice of contemplated action and a right to appeal the decision.

Motion as to Mascarenas ¶ 27, at 7 (citing Perez Aff. 18, at 4).  Mascarenas disputes this asserted fact, stating that the asserted fact

   is an opinion subject to argument.  Moreover, . . . Mascarenas also specifically contends that he was in fact separated for disciplinary reasons as set out further in the Argument section below.  Plaintiff Mascarenas applied for and was offered employment by the New Mexico Corrections Department at the Springer Correction Center.  Following his acceptance by NMCD, Defendant CYFD alleged misconduct by Plaintiff Mascarenas and contemplated a short disciplinary suspension.  CYFD communicated the allegations of misconduct by Plaintiff Mascarenas to the NMCD. NMCD then withdrew its offer of employment to Mascarenas.  CYFD never proceeded with the disciplinary action and neither CYFD nor NMCD ever allowed Mascarenas an opportunity to respond to the allegations.  Consequently, the termination of Plaintiff Mascarenas was the direct result of allegations of misconduct

<u>See</u> Mascarenas Memorandum at 1; Dodson Electronic Mail Transmission at 1; Auten Electronic

Mail Transmission at 1.

_____

      against him which he denies and to which he has never had an opportunity for
      response.

Response at 5-6 (citing Office Memorandum From Elona B. Cruz, Human Resource Bureau Chief to Tom Mascarenas (dated November 28, 2006), filed February 22, 2011 (Doc. 58-6)("Mascarenas Memorandum"); Electronic Mail Transmission from Dorian Dodson to Geri Galvan (dated November 29, 2006), filed February 22, 2011 (Doc. 58-6)("Dodson Electronic Mail Transmission"); Electronic Mail Transmission from Barbara Auten to Elona Cruz, Sandra K. Perez, Dorian Dodson, Marcy Ojinaga, Danny R. Dandoval (dated November 30, 2008), filed February 22, 2011 (Doc. 58-6)("Auten Electronic Mail Transmission"). The Defendants argue that Exhibit 6 -- the Mascarenas Memorandum, the Dodson Electronic Mail Transmission, and the Auten Electronic Mail Transmission -- cannot generate a factual dispute because an affidavit does not support it. The Mascarenas Memorandum is on the State of New Mexico Corrections Department letterhead; it is dated, and lists the recipient and sender. The appearance, contents, and substances of this document are thus sufficient evidence to support a finding that the document is what Mascarenas suggests. The electronic mail transmissions list the recipient, sender, and the date, and the listed subject matter of the electronic mail transmissions are congruent with the content of the transmissions. The substance and contents of the electronic mail transmissions are thus sufficient evidence to support a finding that the transmissions are what Mascarenas contends. The Mascarenas Memorandum advised Mascarenas that the NMCD was withdrawing its offer of employment. <u>See</u> Memorandum at 1. The electronic mail transmission from Dodson states:

> [A]s Barbara may have told you, we have a pending disciplinary action on the individual at NMBS who talked about fire arms [sic], etc. and it is my understanding that the investigation substantiated the allegation. I know we have a plan to resolve this by Dec 6th or something, . . . but can we talk about resolving what we think we need to do here earlier than that? Because if the impending transfer of folks to NMCD, we need to know . . . where each person falls on a list of job offers, not placed, out for disciplinary actions, etc. etc.

Dodson Electronic Mail Transmission at 1. The electronic mail transmission from Auten states: "**Mr. Mascarenas** is in the disciplinary section of the list, ERB is working on the disciplinary action. I understand Corrections has revoked their job offer, has he received notice? I believe he needs to be placed on the 'unplaced' employees list." Auten Electronic Mail Transmission at 1 (emphasis in original). Taking this evidence in the light most favorable to Mascarenas, the Court will accept as true Mascarenas' version of the asserted fact -- that he was separated from his employment for disciplinary reasons. Because the application of rules which set forth due-process procedures is a legal argument, the Court will not accept this portion of the assertion as a true factual statement, but will address whether Trujillo was entitled to due-process procedures in its legal analysis. <u>See</u> <u>Ruiz v. City of Brush</u>, 2006 WL 1816454, at *4.

-19-

6.     **Plaintiff Joe Bustos.**

Bustos is a Plaintiff in this case.  See, e.g., Complaint at 1; Motion for Summary Judgement as to Joe Bustos ¶ 20, at 6, filed January 31, 2011 (Doc. 54)("Motion as to Bustos")(setting forth this fact); Response at 5 (not controverting this fact).  His position at the Boys School was subject to the RIF.  See, e.g., Complaint ¶ 22, at 6; Motion as to Bustos ¶ 21, at 6 (setting forth this fact); Response at 5 (not controverting this fact).  Bustos applied to be a detention officer at the Colfax County, New Mexico Jail but was not selected.  See, e.g., Deposition of Joe A. Bustos at 60:4-63:3 (taken September 14, 2010), filed January 31, 2011 (Doc. 54-4); Motion as to Bustos ¶ 22, at 7 (setting forth this fact); Response at 5 (not controverting this fact).  Bustos does not believe that the administration had any ill will towards the Plaintiffs and he has no evidence that they were trying to drive him out of his job.  See, e.g., Bustos Depo. at 42:16-23; Motion as to Bustos ¶ 23, at 7 (setting forth this fact); Response at 5 (not controverting this fact).  Bustos states that he had no idea that the Boys School was closing and that he had only a one-hour notice.  See, e.g., Bustos Depo. at 28:7-16; Motion as to Bustos ¶ 24, at 7 (setting forth this fact); Response at 5 (not controverting this fact).  Bustos does not feel that his separation from employment with the State was a result of retaliation for speaking out and does not have any evidence that anyone was retaliating against him for anything.  See, e.g., Bustos Depo. at 44:4-12; Motion as to Bustos ¶ 25, at 7 (setting forth this fact); Response at 5 (not controverting this fact).  Bustos was separated from his employment, as his position no longer existed pursuant to 1.7.10.9 NMAC.  See, e.g., Perez Aff. ¶ 17, at 4; Motion as to Bustos ¶ 26, at 7 (setting forth this fact); Response at 5 (not controverting this fact).  Bustos was not separated from his employment based on work performance.[12]  See Perez Aff. 18, at 4.

---

[12] The Defendants assert:

7.      **Plaintiff Richard Gonzales**.

Gonzales is a Plaintiff in this case.  See, e.g., Complaint at 1; Motion for Summary Judgement as to Richard Gonzales ¶ 20, at 6, filed January 31, 2011 (Doc. 55)(setting forth this fact)("Motion as to Gonzales"); Response at 5 (not controverting this fact).  His position at the Boys School was subject to the RIF.  See, e.g., Complaint ¶ 22, at 6; Motion as to Gonzales ¶ 21, at 6 (setting forth this fact); Response at 5 (not controverting this fact).  Gonzales testified that the Defendants offered one job at a health center in Las Vegas to the people at the Boys School.[13]

_____

> Those 8 employees, including . . . Bustos, were not separated from their employment based on work performance.  As such, the State Personnel Rules relating to terminations for just cause were not implicated which included written notice of contemplated action, a response thereto, a notice of contemplated action and a right to appeal the decision.

Motion as to Bustos at 7 (citing Perez Aff. 18, at 4).  Bustos responds that he disputes this statement, as it "is a legal opinion subject to argument as discussed more fully below in the Argument section of this response."  Response at 5.  The assertion that Bustos was not separated from his employment based on work performance is an assertion of fact, and is not a legal opinion.  Because Bustos has not directed the Court's attention to evidence in the record controverting this asserted fact, the Court will deem this asserted fact admitted.  See D.N.M.LR-Civ. 56.1(b).  Because the application of rules which set forth due-process procedures is a legal argument, the Court will not accept this portion of the assertion as a true factual statement, but will address whether Bustos was entitled to due-process procedures in its legal analysis.  See Ruiz v. City of Brush, 2006 WL 1816454, at *4.

[13] The Defendants assert that Gonzales was offered a job at the health center in Las Vegas. See Motion as to Gonzales ¶ 22, at 6 (citing Gonzales Depo. at 47:10-13).  Gonzales disputes this asserted fact, because "his deposition testimony cited by Defendants [sic] motion was that he never applied for employment in Las Vegas, New Mexico because it would require a round trip commute of 220 miles per day."  Response at 5.  In his deposition, Gonzales testified:

> Q.  Right.  Did anyone ever tell you that if you didn't take one of these other jobs, that there would be no job for you?
>
> A.  Well, we knew if we didn't take one of them jobs, there wasn't going to be any jobs for us because there wasn't any jobs, you know, in the different areas of the state.  And I still go through that now, you know, there is no job.  There wasn't that many jobs that they offered to begin with.

-21-

See Gonzales Depo. at 47:10-15.  Gonzales did not apply for that job, as it was too far.  See, e.g.,

Gonzales Depo. at 47:13-15; Motion as to Gonzales ¶ 23, at 7 (setting forth this fact); Response at

5 (not controverting this fact).  Gonzales was told at a meeting with Perez and Dodson that, if he did

not find another job, he would be laid off.  See, e.g., Gonzales Depo. at 48:4-7; Motion as to

Gonzales ¶ 24, at 7 (setting forth this fact); Response at 5 (not controverting this fact).  Gonzales

does not have any evidence that the fact that his being laid off was for any other reason than the

closing of the Boys School.  See, e.g., Gonzales Depo. at 64:13-65:10; Motion as to Gonzales ¶ 25,

at 7 (setting forth this fact); Response at 5 (not controverting this fact).  Gonzales was separated

from his employment, as his position no longer existed pursuant to 1.7.10.9 NMAC.  See, e.g., Perez

Aff. ¶ 17, at 4; Motion as to Gonzales ¶ 26, at 7 (setting forth this fact); Response at 5 (not

controverting this fact).  Gonzales was not separated from his employment based on work

performance.[14]  See Perez Aff. 18, at 4.

_____

        Q.  How many jobs were offered?

        A.  They just offered that one in Vegas at the health facility there.  And I think, I believe one guy that worked there took that job.

        Q.  Did you apply for any of those jobs?

        A.  No, sir.  It was too far.

Deposition of Richard F. Gonzales at 47:10-15 (taken September 8, 2010), filed January 31, 2011 (Doc. 55-4).  Because this evidence controverts the assertion that the Defendants offered Gonzales a job, the Court will accept as true Gonzales' version of the asserted fact that the Defendants informed the Boys School employees that one job was open at a health facility in Las Vegas.  See Hunt v. Cromartie, 526 U.S. at 551.

    [14] The Defendants assert:

Those 8 employees, including . . . Gonzales, were not separated from their employment based on work performance.  As such, the State Personnel Rules relating to terminations for just cause were not implicated which included written

-22-

8.      **Plaintiff Ed Abreu.**

Abreu is a Plaintiff in this case.  See, e.g., Complaint at 1; Motion for Summary Judgement as to Edward Abreu ¶ 20, at 8, filed January 31, 2011 (Doc. 56)("Motion as to Abreu")(setting forth this fact); Response at 4 (not controverting this fact).  Abreu's position at the NMBS was subject to the RIF.  See, e.g., Complaint ¶ 22, at 6; Motion as to Abreu ¶ 21, at 8 (setting forth this fact); Response at 4 (not controverting this fact).  Abreu interviewed for and was offered a position as Superintendent of Area 1, but declined the offer as the pay was lower than his Boys School position.  See, e.g., Deposition of Edward L. Abreu, Jr. at 145:14-146:15, 188:10-17 (taken September 7, 2010), filed January 31, 2011 (Doc. 56-4); Motion as to Abreu ¶ 22, at 8 (setting forth this fact); Response at 4 (not controverting this fact).  Abreu does not believe the Governor, Perez, or Dodson had any animosity towards him or the other Plaintiffs.[15]  See Abreu Depo. at 245:7-22.  Abreu believes that Perez' and Dodson's actions were something they had to do.  See, e.g., Abreu Depo.

_____

notice of contemplated action, a response thereto, a notice of contemplated action and a right to appeal the decision.

Motion as to Gonzales ¶ 27, at 7 (citing Perez Aff. 18, at 4).  Gonzales disputes this asserted fact, stating that the statement "is a legal opinion subject to argument as discussed more fully below in the argument section of this response."  Response at 5.  The assertion that Gonzales was not separated from his employment based on work performance is an assertion of fact, and is not a legal opinion.  Because Gonzales has not directed the Court's attention to evidence in the record controverting this asserted fact, the Court will deem this asserted fact admitted.  See D.N.M.LR-Civ. 56.1(b).  Because the application of rules which set forth due-process procedures is a legal argument, the Court will not accept this portion of the assertion as a true factual statement, but will address whether Gonzales was entitled to due-process procedures in its legal analysis.  See Ruiz v. City of Brush, 2006 WL 1816454, at *4.

[15] The Defendants assert that Abreu "does not believe the Governor, Sandra Perez, or Dorian Dotson had any animosity towards him or the Plaintiffs."  Motion as to Abreu ¶ 23, at 8 (citing Abreu Depo. at 245:17-22).  Abreu disputes the materiality of this asserted fact.  See Response at 4.  Because Abreu has not directed the Court's attention to evidence controverting the Defendants' disputed fact, the Court will deem the Defendants' asserted fact admitted, see D.N.M.LR-Civ. 56.1(b), and address the materiality of the fact in its legal analysis.

at 245:7-16; Motion as to Abreu ¶ 24, at 9 (setting forth this fact); Response at 4 (not controverting

this fact). Abreu does not believe the closure of the Boys School was done to get rid of him or the

other Plaintiffs. See, e.g., Abreu Depo. at 255:17-256:2; Motion as to Abreu ¶ 25, at 9 (setting forth

this fact); Response at 4 (not controverting this fact). Abreu was separated from his employment

as his position no longer existed pursuant to 1.7.10.9 NMAC. See, e.g., Perez Aff. ¶ 17, at 4;

Motion as to Abreu ¶ 26, at 9 (setting forth this fact); Response at 4 (not controverting this fact).

Abreu was not separated from his employment based on work performance.[16] See Perez Aff. 18,

at 4. Abreu's expectation was that he would remain a state employee and be "assigned somewhere,"

Abreu Depo. at 183:25-184:2; he assumed "they were going to find positions for us with the

Department of Corrections," Abreu Depo. at 152:21-22. See Motion as to Abreu ¶ 28, at 9 (setting

---

[16] The Defendants assert:

> Those 8 employees, including . . . Abreu, were not separated from their employment
> based on work performance. As such, the State Personnel Rules relating to
> terminations for just cause were not implicated which included written notice of
> contemplated action, a response thereto, a notice of contemplated action and a right
> to appeal the decision.

Motion as to Abreu ¶ 27, at 9 (citing Perez Aff. 18, at 4). Abreu disputes this asserted fact, stating:

> The overwhelming evidence, including Statements Nos. 21-26, demonstrate that
> plaintiffs were terminated because they were not chosen by CYFD or other agencies
> to continue their employment. The choice to not continue plaintiff's employment
> was based on discretionary factors. Further, whether State Personnel Board Rules
> relating to termination for just cause were implicated is a legal opinion subject to
> argument as discussed more fully below in the argument section of this response.

Response at 5. The assertion that Abreu was not separated from his employment based on work
performance is an assertion of fact, and is not a legal opinion. Because Abreu has not directed the
Court's attention to evidence in the record controverting this asserted fact, the Court will deem this
asserted fact admitted. See D.N.M.LR-Civ. 56.1(b). Because the application of rules which set
forth due-process procedures is a legal argument, the Court will not accept this portion of the
assertion as a true factual statement, but will address whether Abreu was entitled to due-process
procedures in its legal analysis. See Ruiz v. City of Brush, 2006 WL 1816454, at *4.

forth this fact); Response at 4 (not controverting this fact).  Abreu had interviewed for his prior

positions in his twenty-five years with the State.  See, e.g., Abreu Depo. at 187:15-22; Motion as

to Abreu ¶ 29, at 9 (setting forth this fact); Response at 4 (not controverting this fact).  Abreu

applied for a position at Area 1, which he was offered and declined.  See, e.g., Abreu Depo. at

166:17-167:1; Motion as to Abreu ¶ 30, at 9 (setting forth this fact); Response at 4 (not

controverting this fact).  In August 2006, Abreu knew that the Boys School was closing and was

going to transition into to a Corrections Department facility.  See, e.g., Abreu Depo. at 151:24-

152:5; Motion as to Abreu ¶ 31, at 9 (setting forth this fact); Response at 4 (not controverting this

fact).  The Corrections Department informed Abreu that it would be taking over the house in which

he lived.  See, e.g., Abreu Depo. at 148:7-12; Motion as to Abreu ¶ 32, at 10 (setting forth this fact);

Response at 4 (not controverting this fact).  Abreu believed it was reasonable to assume that, as a

state employee, he would get another job with the State, with comparable pay and position.[17]

---

[17] The Defendants assert: "Abreu [sic] expectation was that the State would provide him with
a job at the same rate of pay regardless of openings, availability, interviews, applications or other
standard placement procedures."  Motion as to Abreu ¶ 33, at 10 (citing Abreu Depo. 182:17-
183:10, 201:21-24).  Abreu disputes that asserted fact, noting that the "evidence cited does not
support the statement as articulated."  Response at 4.  In his deposition, Abreu testified:

Q.  You knew you had been offered this other position that you didn't want to take,
Area 1?

A.  This was way before that.  After they told me, when I talked to Keith Smith, he
was the one who said, "Ed, if you're serious about this," and I said, "Yes, I am."
You know, "If you're serious about working," "Yes, I am," "Your hours are going
to be basically what you're doing here at the Boys School."  I said, "How about my
pay?"  "Let me check on that."

     "How about the house, am I going to be able to stay in the house?"  He said,
"Let me check on that."  When he came back and said, "I talked to" so-and-so,
Dorian Dodson and whoever else, Mr. Gillespie, "it's going to be a JCO Manager
position, just like the JCO Managers here at the Boys School, the maximum pay, the
minimum pay, and that's it."  I said, "No vehicle, no house, like I'm working with

<u>See</u> Abreu. Depo. at 201:14-25.

## **PROCEDURAL HISTORY**

On September 19, 2008, the Plaintiffs filed their Complaint for Violation of Civil Rights with Alternative Petition for Declaratory and Injunctive Relief in the Eighth Judicial District Court in the County of Colfax in the State of New Mexico. <u>See</u> Doc. 1-2. In Count I, the Plaintiffs allege breach of employment contract against CYFD and SPO; in Count II, the Plaintiffs allege deprivation of Property and Liberty Rights Without Due Process of Law Contrary to Sections 1983 and 1985 against Dodson and Perez; and in Count III the Plaintiffs set forth an alternative petition for declaratory or injunctive relief. <u>See</u> Complaint, Counts I, II, and III. On October 28, 2008, the Defendants filed a Petition for Removal of Cause to Federal Court, stating that the Court had

---

right now?"

       "No, they're not offering that." Then I said, "Well, I'm not going to take that."

Abreu Depo. at 182:17-183:10. He further testified:

    Q. And all I'm saying is, so in 2006, you believed it was reasonable to assume that as a State employee, you for sure were going to get another job with the same and comparable pay and position regardless?

    A. Yes, sir.

    . . . .

    Q. Did you believe or did you not believe you would have to apply for it?

    A. I had no idea. I probably, the way I did it all the time, competitive applications, I'd probably have to apply for it, but I've seen where they don't.

Abreu Depo. at 201:14-25. Because the evidence supports the Defendants' asserted fact, and because Abreu has not directed the Court's attention to evidence controverting the Defendants' asserted fact, the Court will deem the Defendants' asserted fact admitted. <u>See</u> D.N.M.LR-Civ. 56.1(b).

jurisdiction over the action pursuant to 28 U.S.C. § 1331.  See Doc. 1.

On January 31, 2011, the Defendants filed motions for summary judgment as to each Plaintiff.  See Docs. 49, 50, 51, 52, 53, 54, 55, 56.  Although the motions for summary judgment contain facts specific to each Plaintiff, the arguments contained in the motions are virtually identical. The Defendants argue that the Boys School was closed and all the positions were eliminated, and that none of the employee were terminated for cause.  They argue that there is no dispute that the RIF was a result of the closure and sale of the Boys School.  They argue that, although the Plaintiffs assert that they should have been allowed pre-termination hearings and public hearings, the Plaintiffs were not terminated -- rather, their positions were eliminated and, as such, the due process clause does not require pre-termination hearings.  They argue that there is no law in New Mexico finding that the state has an obligation upon performing a RIF to find or create jobs for all displaced employees.  They further argue that, even if the Court adopts the Plaintiffs' position, the Defendants would still be entitled to qualified immunity, because there is no clearly established law in New Mexico requiring pre-termination hearings in the context of a legitimate RIF.

On February 22, 2011, the Plaintiffs filed the Plaintiffs' Consolidated Response in Opposition to Defendants' Motion for Summary Judgment.  See Doc. 58.  They do not dispute that a good-faith decision was made to close the Boys School or that the Defendants made a substantial effort to find alternative employment for the large number of Boys School employees.  They argue, however, that the RIF was executed in a manner contrary to their reasonable expectations of continued employment and in a manner contrary to law, that they were not afforded timely notice of their anticipated loss of employment; and that they were not allowed a constitutionally adequate opportunity to respond.

On March 4, 2011, the Defendants filed replies to the Plaintiffs' Response.  See Defendants'

Reply to Plaintiff Antonio Sanchez' Response to Motion for Summary Judgement, filed March 4, 2011 (Doc. 65); Defendants' Reply to Plaintiff Robert Valenzuela's Response to Motion for Summary Judgement, filed March 4, 2011 (Doc. 63); Defendants' Reply to Plaintiff Richard Trujillo's Response to Motion for Summary Judgment, filed March 4, 2011 (Doc. 66); Defendants' Reply to Plaintiff Albert Pino's Response to Motion for Summary Judgment, filed March 4, 2011 (Doc. 62); Defendants' Reply to Plaintiff Tom Mascarenas' Response to Motion for Summary Judgment, filed March 4, 2011 (Doc. 67); Defendants' Reply to Plaintiff Joe Bustos' Response to Motion for Summary Judgment, filed March 4, 2011 (Doc. 68); Defendants' Reply to Plaintiff Richard Gonzales' Response to Motion for Summary Judgment, filed March 4, 2011 (Doc. 64); Defendants' Reply to Plaintiff Ed Abreu's Response to Motion for Summary Judgment, filed March 4, 2011 (Doc. 61). These replies are largely identical. In their replies, the Defendants argue that the RIF was properly conducted, pursuant to the rules. They also argue that the Plaintiffs' employment rights under a RIF have been protected and that the Plaintiffs have no seniority rights. The Defendants also argue that there is no contract law creating a reasonable expectation of continuing employment for employees subject to a RIF and that there is no due-process right to individualized hearings in a non-pretextual RIF. They further argue that there is no need for the Court to reach the issue of declaratory judgment.

At the hearing, the Defendants argued that, "although the [Plaintiffs] may [have] a[ ] property interest [in continued employment,] there aren't the same procedural safeguards necessary in the context of a RIF." Transcript of Hearing at 6:23-25 (taken March 9, 2011)(Dwyer)("Tr.").[18] The Plaintiffs argued that the Tenth Circuit has never adopted a reorganization exception, although

---

[18] The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may have slightly different page and/or line numbers.

they have had the opportunity to do so.  They also argue, however, that their case survives even if the Court believes that the reorganization exception applies, because there is evidence indicating that the RIF was not a neutral plan and that it was a performance-based plan.  They argue that they are entitled to a hearing to determine what criteria was used, whether that criteria impacted their selection, and whether the criteria created stigma.

## LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Rule 56(c) states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case."  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record], together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.")(internal quotation marks omitted).  Once the movant meets this burden, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted).

The party opposing a motion for summary judgment must "set forth specific facts showing

that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

    To survive summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539. Rather, there must be sufficient evidence on

which the fact-finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improv. Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (internal citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Third, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## RELEVANT NEW MEXICO LAW REGARDING EMPLOYMENT CONTRACTS

"The general rule in New Mexico is that an employment contract is for an indefinite period and is terminable at the will of either party unless the contract is supported by consideration beyond the performance of duties and payment of wages or there is an express contractual provision stating otherwise."  Hartbarger v. Frank Paxton Co., 115 N.M. 665, 668, 857 P.2d 776, 779 (1993)(citation omitted).  Either party can terminate an at-will employment relationship "at any time for any reason or no reason, without liability."  Hartbarger v. Frank Paxton Co., 115 N.M. at 668, 857 P.2d at 779

(citation omitted).  New Mexico courts have recognized "an exception to at-will employment for an implied contract based on the words and conduct of the parties, including provisions in a personnel manual or a handbook."  Newberry v. Allied Stores, Inc., 108 N.M. 424, 426, 773 P.2d 1231, 1233 (1989)(internal citations omitted).  A personnel manual or handbook "will not always change the at-will employment relationship if the manual or handbook is not sufficiently specific."  Newberry v. Allied Stores, Inc., 108 N.M. at 426, 773 P.2d at 1233 (citation omitted).  "Under New Mexico law, a personnel manual gives rise to an implied contract if it controlled the employer-employee relationship and an employee could reasonably expect his employer to conform to the procedures it outlined."  Newberry v. Allied Stores, Inc., 108 N.M. at 426, 773 P.2d at 1233 (citation omitted).

The Supreme Court of New Mexico has held that an implied contract of employment between a government employee and government employer may arise from writings that are sufficiently concrete in their representations -- such as an employee handbook or a personnel policy. See Garcia v. Middle Rio Grande Conservancy Dist., 121 N.M. 728, 731-32, 918 P.2d 7, 11-12 (1996).  In Barreras v. State of New Mexico Corrections Department, 133 N.M. 313, 62 P.3d 770 (Ct. App. 2002), the Court of Appeals of New Mexico recognized that the State Personnel Act, along with its attendant rules and regulations, have "attributes of an employ[ment] contract, because they control the employer-employee relationship and give rise to reasonable employee expectations." Barreras v. State of N.M. Corrs. Dep't, 133 N.M. at 315, 62 P.3d at 772 (internal quotation marks and citation omitted).  The Court of Appeals stated that "the State Personnel Act and [its] attendant rules, regulations, and policies" create "enforceable rights in state employees." Barreras v. State of N.M. Corrs. Dep't, 133 N.M. at 315, 62 P.2d at 772.  See Eoff v. N.M. Corrs. Dep't, Nos. CIV 10-0598 JB/RHS, CIV 10-0599 JB/DJS, CIV 10-0600 JB/WDS, 2010 WL 5477679, at *5 (D.N.M.

Dec. 20, 2010)(Browning, J.)(stating that, in Barreras v. State of New Mexico Corrections Department, the Court of Appeals recognized that the State Personnel Act, along with its attendant rules and regulations, have "attributes of an employ[ment] contract, because they control the employer-employee relationship and give rise to reasonable employee expectations").

### RELEVANT LAW REGARDING PROCEDURAL DUE PROCESS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The Due-Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons. See, e.g., County of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998). "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-0633, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).

"The Constitution does not create or define the contours of 'liberty' or 'property,' the 'broad and majestic terms' enshrined in the Fourteenth Amendment." Farthing v. City of Shawnee, Kan., 39 F.3d 1131, 1135 (10th Cir. 1994)(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 571 (1972)). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. " Such an interest arises not from the Due Process Clause of the Constitution itself, but is 'created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract.'" Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007). See

-33-

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577 ("Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."); Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 ("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)); Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").  "In the context of a public employee . . . the touchstone is whether, under state law, the employee has 'a legitimate claim of entitlement' in continued employment, as opposed to a 'unilateral expectation' or 'an abstract need or desire' for it."  Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 (citing Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577; Koopman v. Water Dist. No. 1 of Johnson County, Kan., 972 F.2d 1160, 1164 (10th Cir. 1992)).  "A legitimate claim of entitlement may be grounded in various sources of state law, including 'state statutes, local ordinances, established rules, or mutually explicit understandings.'"  Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 (quoting Dickeson v. Quarberg, 844 F.2d 1435, 1437 (10th Cir. 1988); citing Carnes v. Parker, 922 F.2d 1506, 1509 (10th Cir. 1991).  "If a plaintiff can prove he has a property interest in his employment, a state cannot deprive him of that interest without due process."  Dickeson v. Quarberg, 844 F.2d at 1438.

"Whether appellant has a sufficient property interest in his employment is a matter of state law."  Calhoun v. Gaines, 982 F.2d 1470, 1474 (10th Cir. 1992)(citing Bishop v. Wood, 426 U.S. 341, 344 (1976); Archer v. Sanchez, 933 F.2d 1526, 1529 (10th Cir.1991)).  "[A] property interest

is determined by whether the terms of employment created by contract, federal statute, city charter or an employee manual create a sufficient expectancy of continued employment to constitute a property interest which must be afforded constitutionally guaranteed due process." Graham v. City of Okla. City, Okla., 859 F.2d 142, 146 (10th Cir. 1988)(citation omitted)(alternation in original). "Taken alone, the personnel policy or employee manual might create a property interest." Graham v. City of Okla. City, Okla., 859 F.2d at 146.

"[O]nce it is determined that the Due Process Clause applies, 'the question remains what process is due.'" Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542 (citing Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950)). The Supreme Court has stated:

> We have described "the root requirement" of the Due Process Clause as being "that an individual be given an opportunity for a hearing before he is deprived of any significant property interest." This principle requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination "hearing," though necessary, need not be elaborate. We have pointed out that "[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." In general, "something less" than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (internal citations and footnote omitted).

## ANALYSIS

The Court will grant summary judgment on the Plaintiffs' procedural due-process claims against Dodson and Perez on the grounds of qualified immunity, because there is no clearly

established law requiring pre-termination or post-termination hearings in the context of a RIF. The Court will enter declaratory judgment in the Plaintiffs' favor on the Plaintiffs' request for declaratory judgment on the federal law issues regarding their entitlement to pre- and post-termination hearings. Having disposed of the Plaintiffs' federal claims, the Court remands the Plaintiffs' remaining state-law claims -- their breach-of-contract claims and their request for declaratory relief on state law issues -- to the Eighth Judicial District Court, Colfax County, State of New Mexico.

I.     **THE COURT WILL GRANT SUMMARY JUDGMENT ON THE PLAINTIFFS' PROCEDURAL DUE-PROCESS CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS ON THE GROUNDS OF QUALIFIED IMMUNITY.**

The Defendants argue that there is no reasonable expectation of continuing employment for RIFed employees. They argue that the Plaintiffs do not establish an actual property interest. They argue that the Plaintiffs have not cited to any section of the personnel rules which would give a RIFed employee a legitimate expectation of continued employment. They also argue that case law has shown that, when there is a bona fide RIF, pre-termination hearings are not required by the due-process clause. They argue that the Plaintiffs contend that the state has an obligation upon performing a RIF to find or even create jobs for all displaced employees, but there is "no law in New Mexico requiring such steps and this Court should not create a new due process right where it would serve no useful purpose." Response at 11. The Defendants argue that it is well established law to treat a legitimate RIF differently from a for-cause termination. The Defendants argue that, even if the Court takes the Plaintiffs' position as true, the individual Defendants would be entitled to qualified immunity, because there is no clearly established law in New Mexico requiring pre-termination hearings in the context of a legitimate RIF.

The Plaintiffs argue that the right of a tenured public employee to pre-termination notice and

a reasonable opportunity to respond is well recognized at law.  They argue that this right flows from the existence of property rights in tenured public employment and the fact that involuntary termination means loss of that property right.  They argue that this right extends to all involuntary terminations and that the Tenth Circuit has extended the right to respond to employees separated by an alleged RIF where the bona fide nature of the RIF is contested.  They argue that some circuits have recognized a reorganization exception to this rule, but the Tenth Circuit has not done so.  They argue that, even if the reorganization exception applied, the exception is predicated on a neutral RIF devoid of performance-based criteria in the selection of employees for layoff, and that the record is "replete with evidence of performance and personal based criteria affecting the eventual selections of Plaintiffs for layoff."  Response at 15.  The Plaintiffs also argue that their identification as unemployable has damaged their reputations and affected their ability to find employment, and that they are thus entitled to a name-clearing hearing.  The Plaintiffs argue that the individual Defendants are not entitled to qualified immunity, because they have shown a constitutional violation if their allegations are true and because the Supreme Court has recognized the right of a tenured public employee to a hearing to respond to termination for decades.  They also argue that the Tenth Circuit specifically established due-process rights of the tenured public employee terminated for reasons aside from just cause in March 2005 in Copelin-Brown v. New Mexico State Personnel Office, 399 F.3d 1248 (10th Cir. 2005).

### A.  THE PARTIES AGREE THAT THE RIF WAS A BONA-FIDE RIF AND NOT A SUBTERFUGE DESIGNED TO ELIMINATE THE PLAINTIFFS.

The RIF was a bona-fide RIF; it was not a subterfuge designed to eliminate the Plaintiffs. The New Oxford American Dictionary defines "bona fide" as "genuine; real" and lists the origin of "bona fide" as Latin, "literally 'with good faith."  New Oxford American Dictionary 194 (3d ed.,

Oxford University Press 2010).  In <u>West v. Grand County</u>, 967 F.2d at 362 (10th Cir. 1992), the

Tenth Circuit stated that it need not speculate whether a pre-termination hearing would be required

in circumstances involving a termination as the result of a bona fide RIF, because, in the case before

it, the RIF was directed at one person who alleged that the RIF "was actually just a subterfuge

designed to terminate her without establishing the required cause."  967 F.2d at 367.  This definition

is in line with the <u>New Oxford American Dictionary</u>'s definition of bona fide as genuine, or, literally

as "with good faith."

   The parties agree that the RIF was a bona fide RIF.  The Defendants assert that the RIF was

"bona fide."  Motion as to Sanchez at 9.  The Plaintiffs concede that the RIF was a bona-fide RIF.

<u>See</u> Response at 8, 9.  The Plaintiffs state:

> Plaintiffs do not dispute that a good faith decision was made to close the New
> Mexico Boys School and convert its use to an adult detention facility.  Nor do
> Plaintiffs dispute that Defendants CYFD and SPO made a substantial effort to find
> alternative employment for the large number of NMBS employees affected by the
> decision to close NMBS.

Response at 8.  The Plaintiffs state that they do "not contest the authority of Defendant CYFD to

close NMBS, or its authority to conduct a [RIF]."  Response at 9.  The undisputed facts establish

that a decision was made to close the Boys School, and it closed.  <u>See</u> Wilson Aff.  ¶ 5, at 2 ("On

or about December 2005, I along with the Governor and the Director of the Legislative Council

Service, David Abbey, made the decision to close the NMBS."); Motion as to Sanchez ¶ 1, at 4

(setting forth this fact); Response at 4-8 (not controverting this fact).  The decision to close the Boys

School was based upon an overabundance of beds available for youth detention across the State of

New Mexico.  <u>See, e.g.</u>, Wilson Aff. ¶ 6, at 2; Motion as to Sanchez ¶ 2, at 4 (setting forth this fact);

Response at 4-8 (not controverting this fact).  Another reason the Boys School was closed is that it

was located in an isolated rural area of the state, and it had become difficult to recruit and retain

qualified behavioral and mental health professionals to treat the youth the courts committed to the long-term juvenile justice facility.  See, e.g., Affidavit of Dorian Dodson ¶ 7, at 2 (sworn to January 24, 2011), filed January 31, 2011 (Doc. 49-2); Motion as to Sanchez ¶ 3, at 4 (setting forth this fact); Response at 4-8 (not controverting this fact).  Today's youth have higher behavioral health and/or mental needs than did youth in the past, which mandates an increased need for behavioral and mental health professionals.  See, e.g., Dodson Aff. ¶ 7, at 2; Motion as to Sanchez ¶ 3, at 4 (setting forth this fact); Response at 4-8 (not controverting this fact).  In addition, the decision to close the Boys School was based upon the terms of a settlement agreement in another case in which a CYFD entity was a named defendant.  See Wilson Aff. ¶ 6, at 2; Motion as to Sanchez ¶ 4, at 5 (setting forth this fact); Response at 4-8 (not controverting this fact).  The  Department of Corrections was to purchase and purchased the Boys School.  See Wilson Aff. ¶ 7, at 2; Motion as to Sanchez ¶ 5, at 5 (setting forth this fact); Response at 4-8 (not controverting this fact).  The parties thus agree that the RIF was a bona fide RIF.  The Plaintiffs' argument centers on the assertion that the manner in which the selection criteria for new jobs in the bona fide RIF were applied violated their constitutional rights.  See Response at 11 (arguing that their "leftover status was not simply happenstance").  The Plaintiffs are not arguing that the RIF was not a bona fide RIF; instead, they are arguing that they were separated from their employment without a hearing.

**B.    THE PLAINTIFFS HAD PROTECTED PROPERTY INTERESTS THAT SURVIVED THE RIF.**

The Defendants argue that the Plaintiffs do not have a property interest.  "Property interests . . . are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those

benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  See Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 ("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)); Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").  "In the context of a public employee . . . the touchstone is whether, under state law, the employee has 'a legitimate claim of entitlement' in continued employment, as opposed to a 'unilateral expectation' or 'an abstract need or desire' for it."  Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 (citing Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577 and Koopman v. Water Dist. No. 1 of Johnson County, Kan., 972 F.2d 1160, 1164 (10th Cir. 1992)).  "A legitimate claim of entitlement may be grounded in various sources of state law, including 'state statutes, local ordinances, established rules, or mutually explicit understandings.'"  Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 (quoting Dickeson v. Quarberg, 844 F.2d at 1437; citing Carnes v. Parker, 922 F.2d at 1509).  "If a plaintiff can prove he has a property interest in his employment, a state cannot deprive him of that interest without due process."  Dickeson v. Quarberg, 844 F.2d at 1438.

"Whether appellant has a sufficient property interest in his employment is a matter of state law."  Calhoun v. Gaines, 982 F.2d at 1474 (citing Bishop v. Wood, 426 U.S. at 344; Archer v. Sanchez, 933 F.2d at 1529).  "[A] property interest is determined by whether the terms of employment created by contract, federal statute, city charter or an employee manual create a sufficient expectancy of continued employment to constitute a property interest which must be afforded constitutionally guaranteed due process."  Graham v. City of Okla. City, Okla., 859 F.2d at 146 (citation omitted)(alternation in original).  "Taken alone, the personnel policy or employee

manual might create a property interest." Graham v. City of Okla. City, Okla., 859 F.2d at 146.

The Tenth Circuit stated in Copelin-Brown v. New Mexico State Personnel Office:

> Property interests are not created by the Constitution, but rather by independent sources such as state law. "[W]hen a person's employment can be terminated only for specified reasons, his or her expectation of continued employment is sufficient to invoke the protections of the Fourteenth Amendment." West v. Grand County, 967 F.2d 362, 366 (10th Cir.1992). New Mexico law clearly states that employees that have completed a probationary period of one year may only be terminated for just cause. N.M. Stat. Ann. § 10-9-18(F); Barreras v. State of N.M. Corrs. Dept., 133 N.M. 313, 62 P.3d 770, 775 (2002); N.M. Admin. Code tit. 1, § 7.11.10 (only non-disabled employees).
>
> . . . .
>
> These restrictions on the government's ability to terminate are sufficient to create a property interest in Ms. Copelin-Brown.

399 F.3d at 1254.

Some courts, including the Tenth Circuit, have considered whether a constitutionally protected property interest in employment survives a RIF. See Theis v. Denver Bd. of Water Comm'rs, 149 F.3d 1191, at *2 (10th Cir. 1998)(Table)(recognizing that several courts have held that a property interest in continued employment may not survive a bona fide RIF, but not deciding whether it would recognize a reorganization exception to procedural due-process requirements in cases of bona fide RIFs, because "even if Theis' assumed property interest in his employment survived elimination of his position, he was granted all the pre-termination process that was due."); Wash. Teachers' Union Local No. 6, Am. Fed'n of Teachers, AFL-CIO v. Bd. of Educ. of the Dist. of Columbia, 109 F.3d 774, 780 (D.C. Cir. 1997)(stating that it need not resolve the question whether the RIF extinguished the teachers' property interests in their jobs)(citing Am. Fed'n of Gov't Employees v. OPM, 821 F.2d 761, 767 (D.C.Cir.1987)("[I]t is by no means obvious that a property interest . . . survive[s] a reduction-in-force")).

In <u>American Federation of Government Employees v. OPM</u>, the United States Court of

Appeals for the District of Columbia stated:

> Because <u>Loudermill</u> involved a termination for cause, not a reduction-in-force, it is by no means obvious that a property interest in continued employment is even implicated here. But assuming <u>arguendo</u> that a property interest in continued employment does survive a reduction-in-force, whether a pre-termination hearing is constitutionally required necessarily turns in part on a balance between employee stigma and employer interests. Unlike a termination for cause, which is inherently stigmatizing because it reflects adversely upon the employee, a RIF termination does not clearly label a laid-off worker. Indeed, appellants do not even argue that RIF terminations <u>automatically</u> stigmatize employees -- their concern is with those RIF terminations based in part on less favorable performance evaluations. But, surely there would be cases under the new regulations where an employee would lose his position in a RIF, yet suffer absolutely no stigma. We think we would be on "surer footing," therefore, if we wait for a specific employee's challenge to his layoff and then determine if any stigma associated with that layoff gives rise to a pretermination hearing right. <u>See</u> <u>Toilet Goods Ass'n v. Gardner</u>, 387 U.S. 158, 164 (1967).
>
> Given the dependency of appellants' constitutional claim on the facts of an individual employee's case, the interest of the court in postponing review . . . is substantial. Furthermore, we believe OPM's failure to provide pre-termination hearing rights has little "immediate and practical impact" on federal employees. That federal employment may in some sense be "less valuable," as appellants claim, in the absence of such hearing rights is an insufficient consideration, given the current abstract posture of this challenge, to justify immediate review.

821 F.2d at 767-68 (emphasis in original).

In <u>Washington Teachers' Union Local No. 6, American Federation of Teachers, AFL-CIO</u>

<u>v. Bd. of Educ. of the Dist. of Columbia</u>, the D.C. Circuit stated:

> We have no doubt that prior to the 1996 RIF, District teachers enjoyed a constitutionally protected property interest in their jobs. <u>See</u> D.C.Code Ann. § 1-617.1 (1992 Repl.); <u>Loudermill</u>, 470 U.S. at 538 . . . ; <u>cf.</u> <u>Board of Regents v. Roth</u>, 408 U.S. 564 . . . (1972). We are less sure whether enactment of the 1996 Budget Act and of the emergency rules extinguished their property interests. <u>See</u> <u>American Federation of Government Employees v. OPM</u>, 821 F.2d 761, 767 (D.C.Cir.1987) ("it is by no means obvious that a property interest . . . survive [s] a reduction-in-force"). But we need not resolve that question. Even assuming teachers' property interests survived the 1996 RIF, we think nothing in principles of due process required giving teachers an opportunity to respond to their rankings prior to

termination.

109 F.3d at 779-80.

In Thompson v. District of Columbia, 428 F.3d 283 (D.C. Cir. 2005), the Honorable Harry

T. Edwards, Circuit Judge, stated, in a concurring opinion:

> In determining whether Thompson had a protected property interest, the District Court will be forced to decide whether to focus on the time before or after Thompson was transferred to the new position that was eliminated by the Board during the purported RIF. If Thompson's earlier position is relevant for assessing his due process entitlements, and if the District Court finds that he was a career service employee subject only to termination for cause, then Loudermill suggests that his expectation in continued employment constituted a protected property interest. See Loudermill, 470 U.S. at 538-39 . . . . On the other hand, if the relevant focal point is Thompson's RIF'd position, it is less clear whether he enjoyed a property right.
>
> At least two decisions issued by this court have suggested that the existence of a property right in a government job -- particularly a position eliminated under the auspices of the District's 1996 Budget Act, as Thompson's position ostensibly was -- does not survive a fiscally induced layoff. See Wash. Teachers' Union Local # 6 v. Bd. of Educ. of the Dist. of Columbia, 109 F.3d 774, 779-80 (D.C. Cir. 1997); Am. Fed'n of Gov't Employees v. Office of Pers. Mgmt., 821 F.2d 761, 767 (D.C. Cir. 1987). I suppose that the argument under this line of analysis might be that an employee cannot hold a "property right" tied to a RIF'd position, because a person in a position slated for a RIF has no reasonable expectation of continued employment. I doubt that the case law of this circuit means to go this far, however. To date, the most that we have said is that "it is by no means obvious that a property interest . . . . survive[s] a reduction-in-force." Am. Fed'n of Gov't Employees, 821 F.2d at 767. And in Washington Teachers' Union, the court suggested only that "enactment of the 1996 Budget Act and of the emergency rules" may have "extinguished [the RIF'd employees'] property interests." 109 F.3d at 779. It would be a mistake to make too much of these decisions.
>
> It is noteworthy that our sister circuits have not shared our doubts about the survival of a property interest after a RIF, especially where the former employee asserts that the RIF was really a subterfuge for firing a particular individual. In West v. Grand County, 967 F.2d 362, 367 (10th Cir.1992), for example, the Tenth Circuit explained that it had "no doubts" that an employee alleging a pretextual RIF maintained her protected property interest, arguing that the very function of a hearing would be to determine whether or not the RIF had been legitimate. Labeling an employee's termination "a 'reduction in force' does not affect her entitlement to a pretermination hearing when she is asserting that the reduction in force was a sham aimed particularly at her." Id. at 368. The Seventh Circuit employed similar

reasoning in <u>Lalvani v. Cook County</u>, 396 F.3d 911 (7th Cir. 2005).  The court emphasized that "the mere intonation of the acronym 'RIF'" does not avoid the need for a due process hearing, the very purpose of which is "precisely to find out whether the termination under the auspices of a RIF was permissible or not."  <u>Id.</u> at 915 (citations and quotations omitted); <u>see also</u> <u>Whalen v. Mass. Trial Court</u>, 397 F.3d 19, 26 (1st Cir. 2005) (stating that where "it seems inescapable that [an employee's] job performance" influenced selection for a reorganization layoff, it is fundamental "that some process is due"); <u>Misek v. Chicago</u>, 783 F.2d 98, 101 (7th Cir. 1986) ("Accordingly, absent good cause, [RIF'd employees] were improperly dismissed unless on remand it should be determined that their discharge was pursuant to an actual reorganization of the agency.").

This court has yet to determine what process is due when an employee contends that his RIF was a subterfuge. We have merely suggested that the extent of necessary pretermination process may depend upon the number of individuals subject to a RIF.  <u>See</u> <u>Wash. Teachers' Union</u>, 109 F.3d at 780-81; <u>UDC Chairs</u>, 56 F.3d at 1474 ("Where, as here, the deprivation turns on a policy decision and not on an individual's characteristics, a pre-deprivation hearing would do little to reduce the risk of erroneous deprivation of the [employees'] interests."); <u>see also</u> <u>Whalen</u>, 397 F.3d at 25 ("[B]ecause reorganizations often affect numerous employees, the governmental interest in efficient administration may weigh more heavily in such circumstances."). It is significant, however, that this court has never rejected the principle enunciated in <u>West</u>, i.e., that an otherwise protected civil service employee alleging a pretextual RIF retains his protected property interest and, thus, may insist on notice and an opportunity to respond. <u>See West</u>, 967 F.2d at 367.

In this case, then, the question whether Thompson held a protected property interest in his pre-transfer position will antecede any further analysis. Whether or not a property interest survives a RIF, Thompson will have no entitlement to notice and a hearing of any sort if he never had a property interest in the first place. Moreover, the facts alleged in this case are more complicated than those presented in other circuits' cases dealing with allegedly pretextual RIFs. Whereas those cases dealt with individuals who occupied protected positions slated for elimination, they do not provide insight into how to treat an employee who claims the sham was his transfer from a protected position into a doomed position, not selection of the position to be RIF'd. The District Court must consider this matter on remand in determining whether Thompson had a protected property right.

428 F.3d at 291-92 (Edwards, J., concurring).[19]

---

[19] It would be an odd result if a court were to say that a person alleging a pretextual RIF maintains his or her property interest, but that a person who does not allege that the RIF was pretextual does not maintain his or her property interest.  The existence of a property interest should not turn on what a person is alleging.  A person should either have a property interest or not.

The Tenth Circuit has never stated that a property interest does not survive a bona fide RIF.
See Theis v. Denver Bd. of Water Comm'rs, 149 F.3d 1191, at *2.  In West v. Grand County, the
Tenth Circuit found that West, a permanent employee who was terminated as a result of a RIF, had
a property interest in continued employment, stating:

> This Circuit has made it clear that when a person's employment can be
> terminated only for specified reasons, his or her expectation of continued
> employment is sufficient to invoke the protections of the Fourteenth Amendment.
>
> Under Grand County's Personnel Policies and Procedures manual, West was
> a permanent employee who could not be discharged "except for cause or reasons of
> curtailment of work or lack of funds."  Grand County Personnel Policies and
> Procedures, art. I, § XIV(A).  Utah's merit statute, Utah Code § 17-33-8(2), does not
> supersede this manual to make West's position "exempt" rather than permanent.
> Utah Code § 17-33-1(4) states: "This chapter shall be optional with counties having
> fewer than 130 employees not covered by other merit systems."  (emphasis added).
> Because Grand County has less than 130 employees who are not covered by other
> merit systems (e.g., peace officers' or firemen's merit systems, as referenced in
> section 17-33-1(3)), it can opt to have its own merit system under the plain language
> of the Act.  This interpretation is consistent with the state's policy to grant counties
> a certain degree of autonomy.
>
> Grand County clearly opted to have its own merit system, as delineated in its
> Personnel Policies and Procedures manual.  Its restrictive discharge policy gave West
> a property interest in continued employment that could not be curtailed without
> constitutional protections.  Accordingly, we affirm the district court's finding that
> West was entitled to due process.

967 F.2d (citations and footnote omitted).  The Tenth Circuit's "clear precedent" states that
"employees who can be terminated only for specific reasons" have "protected property interests,"
and the Tenth Circuit did not intimate, in West v. Grand County, that this protected property interest
does not survive a RIF.  West v. Grand County, 967 F.2d at 367.  The Tenth Circuit stated, in
Copelin-Brown v. New Mexico State Personnel Office, that New Mexico state employees who have
completed the probationary period of one year have a protected property interest, stating that "New
Mexico law clearly states that employees that have completed a probationary period of one year may

only be terminated for just cause." 399 F.3d at 1248.

All of the Plaintiffs had a protected property interest which survived the RIF.  The Court need not analyze the Plaintiffs separately, because its legal analysis -- not factual analysis -- is limited to only whether New Mexico law created a sufficient expectancy of continued employment, and whether, if New Mexico law creates a sufficient expectancy of continued employment, a RIF should extinguish that property interest.

The Plaintiffs had a protected property interest.  New Mexico law states that the Plaintiffs could "be suspended, demoted, or dismissed only for just cause."  NMAC 1.7.11.10.  See NMSA 1978, § 10-9-18F (governing appears from employees who are dismissed, demoted, or suspended); Barreras v. State of N.M. Corrs. Dept., 133 N.M. at 318, 62 P.3d at 775 (stating that the State Personnel Act and its attendant rules and regulations may create an implied contract).  The Tenth Circuit has recognized that New Mexico law creates a property interest in continued employment for state employees who have completed a probationary period of one year.  See Copelin-Brown v. N.M. State Pers. Office, 399 F.3d at 1248 (finding that the plaintiff had a protected property interest and stating that "New Mexico law clearly states that employees that have completed a probationary period of one year may only be terminated for just cause")(citations omitted).  The Court thus finds that the Plaintiffs had expectations of continued employment and thus a constitutionally protected property interest.  See Farthing v. City of Shawnee, Kan., 39 F.3d at 1135.

The New Mexico Administrative Code states that "[a]n agency may lay off employees only for deletion of positions, shortages of work or funds, or other reasons that do not reflect discredit on the services of the employees."  NMAC 1.7.10.9A.  The code further states that "[a]n agency shall identify organizational units for purposes of a layoff and submit a written plan to the board."  NMAC 1.7.10.9B.  "Upon board approval of a layoff plan, the agency effecting the layoff shall

initiate a right of first refusal within the agency." NMAC 1.7.10.9C. These provisions do not mean that a reasonable employee would think that he or she does not have a legitimate claim of entitlement in continued employment. Although, pursuant to these provisions in the code, a state employee knows that his or her position can be eliminated, there is a distinction between elimination of a position and separation from state employment. An employee likely does not have a legitimate claim of entitlement to continued employment in a certain position, because, as these provisions of the code make clear, positions may be eliminated. The Court does not believe, however, that, under these provisions of the code, an employee cannot have a legitimate claim of entitlement in continued employment, because, as the code states, when the State Personnel Board approves a layoff plan, the agency must initiate a right of first refusal within the agency. A property interest in continued employment is different from a legitimate claim of entitlement to continued employment in a certain position. Furthermore, in Copelin-Brown v. New Mexico State Personnel Office, the Tenth Circuit addressed the Defendants' arguments that "because the [New Mexico Administrative Code] regulation in question states that a permanently disabled employee can be terminated without a hearing or opportunity to appeal, Ms. Copelin-Brown has no protected property interest," and that "there is no legitimate expectation of continued employment when the essential functions of one's job cannot be performed." 399 F.3d at 1254. The Tenth Circuit disagreed with the Defendants, stating that "[t]he challenged regulation provides that certain determinations must be made before the employee may be terminated because of permanent disability, such as whether the disability is permanent, whether accommodations have been made, and whether the state had considered the employee for other positions." 399 F.3d at 1254. Similarly, the provisions in the New Mexico Administrative Code regarding RIFs provide that certain steps must be taken before an agency may lay off an employee -- such as the agency must submit a written plan and must, upon approval of

the plan, initiate a right of first refusal.  The Court thus believes that the Plaintiffs had protected property interests, despite the provisions in the code providing for RIFs.

The Plaintiffs' property interest survived the RIF.  The D.C. Circuit, although it has discussed whether a property right survives a RIF, has never held that it does not.  Furthermore, the underlying rationale for the argument that a property right does not survive a RIF -- that a person in a position slated for a RIF has no reasonable expectation of continued employment -- is not a strong rationale.  It could also be said that a person who is notified that they will be terminated has no reasonable expectation of continued employment.  If the courts apply this rationale to state that employees' property rights do not survive a RIF or a termination, and thus that the employees were not entitled to the due-process procedures that the Constitution of the United States requires, it appears that it may serve to undercut employees' constitutional rights.  Moreover, Judge Edwards has recognized that "sister circuits have not shared [the D.C. Circuit's] doubts about the survival of a property interest after a RIF."  428 F.3d at 291.

As in West v. Grand County, where the Tenth Circuit found that a permanent employee who could not be discharged except for cause, or for reasons of curtailment of work or lack of funds, had a property interest in continued employment, the Plaintiffs could "be suspended, demoted, or dismissed only for just cause," or as a result of a "deletion of positions [or] shortage of work or funds."  NMAC 1.7.11.10, 1.7.10.9.  The Court thus believes that they had a constitutionally protected property interest, even though they were separated from their employment because of a RIF.  See West v. Grand County, 967 F.2d at 367.  If the Court found that the Plaintiffs' property interests did not survive a RIF, employers would be able to circumvent constitutional requirements by labeling terminations RIFs.  The Court thus declines to find that a constitutionally protected property interest does not survive a RIF.  In the next portion of its opinion, the Court will, however,

-48-

discuss what level of process is appropriate.  It will discuss whether the reorganization exception should apply, under which the a pre-termination hearing would not be required.

### C.    THE PLAINTIFFS WERE ENTITLED TO PRE- AND POST-TERMINATION HEARINGS.

"Once a protected property interest is established, the question then becomes what level of process is appropriate." Copelin-Brown v. N.M. State Pers. Office, 399 F.3d at 1255 (citation omitted). Having determined that the Plaintiffs had property interests in continued employment, and thus were entitled to due process, the Court must address whether the Plaintiffs "received the due process to which [they] were entitled." West v. Grand County, 967 F.2d at 367.

In West v. Grand County, the Tenth Circuit "examine[d] whether the discharge of a public employee pursuant to an alleged reduction in force satisfied the due process requirements of the Fourteenth Amendment to the United States Constitution." 967 F.2d at 364.

> Trisha West served as the legal secretary for Grand County Attorney William Benge for approximately one year.  When she resigned from her former job at First Security Bank to accept this position in 1985, Benge assured her that electoral changes would not jeopardize her position.  After a six-month probationary period, West became a permanent employee according to the Grand County Personnel Manual, which established a civil service system for county employees based upon merit principles.  Accordingly, she could not be terminated except for cause, curtailment of work, or lack of funds.
>
> Nevertheless, West was discharged in 1986 when Elaine Coates defeated Benge in the election for Grand County attorney and Coates allegedly determined that the anticipated workload in the office did not justify employing a full-time secretary. Instead, Coates employed her own former secretary under a different title at her own expense.  Although her assessment of the workload proved erroneous, Coates fulfilled her election promise that she would make the county attorney position more efficient.  She generated $52,000 in additional revenue and reduced the payroll in her department by $6,144.
>
> West contends that the county attorney's reduction in force that eliminated the position of legal secretary was really a subterfuge designed to terminate her without cause.  She asserts that the position of legal secretary was essentially left intact, although under a different title, and that ultimately it was filled by two

-49-

individuals.

. . . .

The procedures employed in this case can be summarized as follows: West did not receive a formal pretermination hearing. However, she received notice of her potential dismissal during a meeting with Coates and she otherwise indicated that she was aware that her job likely was not going to be retained. She also had the opportunity to discuss her rights as a permanent employee with both Coates and the County Commissioners. Following her discharge, West received a grievance hearing before the Commissioners, where her attorney presented witnesses and evidence on her behalf. The Commissioners found that West had not presented substantial evidence to support her claim that the abolition of her position was a subterfuge. The Commissioners concluded that West's termination was the result of a proper reduction in force.

967 F.2d at 364-65 (footnotes omitted). West brought an action under 42 U.S.C. § 1983, alleging, in part, a deprivation of her property interest in violation of the Fourteenth Amendment. See 967 F.3d at 365. The Tenth Circuit affirmed the district court's finding that West had a property interest in continued employment. See 967 F.2d at 366. The Tenth Circuit then addressed "whether West received the due process to which she was entitled." 967 F.2d at 367. The Tenth Circuit stated:

In Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985), the Supreme Court set out the standards for a pretermination hearing. This Circuit reiterated and applied these guidelines and requirements in Powell v. Mikulecky, 891 F.2d 1454, 1458-62 (10th Cir.1989), and Seibert v. University of Oklahoma Health Sciences Center, 867 F.2d 591, 596-99 (10th Cir.1989).

The standards for a pretermination hearing are not stringent because of the expectation that a more formal post-termination hearing will remedy any resulting deficiencies. "[T]he pretermination 'hearing,' though necessary, need not be elaborate . . . . '[T]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.'" Loudermill, 470 U.S. at 545 . . . (quoting Boddie v. Connecticut, 401 U.S. 371, 378 . . . (1971)). "[T]he pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions -- essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." Id. 470 U.S. at 545-46 . . . .

A full evidentiary hearing is not required prior to an adverse employment

-50-

action. Id. at 545 . . . . The individual entitled to due process protection needs only to be given notice and an opportunity to respond. Id. at 546 . . . We have held that pretermination warnings and an opportunity for a face-to-face meeting with supervisors, see Seibert, 867 F.2d at 598, and a conversation between an employee and his supervisor immediately prior to the employee's termination, see Powell, 891 F.2d at 1459, were sufficient to satisfy constitutional requirements.

Several circuits have suggested, without so holding, that the due process clause may not require a pretermination hearing when a termination is the result of a bona fide reduction in force, particularly when the reduction involves a large number of employees and is not directed toward just one employee or a small number of employees. See American Fed'n of Gov't Employees v. Office of Personnel Management, 821 F.2d 761, 767-68 (D.C.Cir.1987); Praprotnik v. City of St. Louis, 798 F.2d 1168, 1177 (8th Cir.1986), rev'd on other grounds, 485 U.S. 112 . . . (1988). The following factors militate against the need for a pretermination hearing in such circumstances: such terminations are not stigmatizing, job performance is not particularly relevant, and pretermination hearings may be impractical. Our case, however, does not present these factors, and thus we need not speculate whether a pretermination hearing would be required in such circumstances.

Here, the asserted reduction in force was directed specifically just at West, and West alleged that the reduction was actually just a subterfuge designed to terminate her without establishing the required cause. Such a termination is potentially stigmatizing and a pretermination hearing would provide an important opportunity for her to argue her claim that the reduction in force was a sham.

Under very similar facts, the Seventh Circuit concluded that an employee was entitled to a pretermination hearing in Misek v. City of Chicago, 783 F.2d 98 (7th Cir.1986). There, the court stated,

> [T]he plaintiffs assert that the reorganization was a sham and that their jobs were never abolished. Thus the plaintiffs have sufficiently alleged that they were fired for "cause" to afford them the protections of due process. To hold otherwise would allow government officials to cry "reorganization" in order to circumvent the constitutional and statutory protections guaranteed . . . .

Id. at 101.

In light of the Tenth Circuit's clear precedent regarding protected property interests for employees who can be terminated only for specific reasons and West's charge that the asserted reduction in force was a sham, we agree with the Seventh Circuit. The fact that Grand County labeled West's discharge a "reduction in force" does not affect her entitlement to a pretermination hearing when she is asserting that the reduction in force was a sham aimed particularly at her. Cf. Goudeau, 823 F.2d

-51-

at 1431 (Although not specifically addressing entitlement to a pretermination hearing, it concluded generally that "[w]ithout adequate due process protection, an employee . . . can never discover whether the reasons offered for her discharge are true-or are false and a mere subterfuge.").

Thus, West was entitled to a pretermination hearing.

967 F.2d at 366.  The Tenth Circuit noted, however, that the standards the Supreme Court delineated for pretermination hearings "are not very stringent," and "agree[d] with the district court that the meetings and consultations in this case satisfied constitutional mandates."  967 F.2d at 368.

The totality of the circumstances here indicate that West knew in advance of her termination that the county attorney proposed to eliminate her job. Furthermore, she had several pretermination opportunities to discuss her potential termination with the new county attorney and other county officials.  As we observed in Seibert, "the totality of the procedures and opportunities which the [employer] afforded plaintiff were sufficient to satisfy constitutional requirements. Plaintiff was not fired out of the blue. Plaintiff was not fired for reasons that he did not know.  Plaintiff was not fired without being given the 'opportunity to present his side of the story.'" 867 F.2d at 599 (quoting Loudermill, 470 U.S. at 542, 105 S.Ct. at 1494).

Here, West met with Coates for two hours on November 18, 1986, after Coates defeated Benge in the election. During this meeting, West later acknowledged, she learned that her job was in jeopardy and she discussed with Coates her rights under Grand County's Personnel Policies and Procedures manual. See R., Deposition of Trisha L. West, Oct. 21, 1988, at 66, 68, 70.  A brief face-to-face meeting with a supervisor provides sufficient notice and opportunity to respond to satisfy the pretermination due process requirements of Loudermill. Powell, 891 F.2d at 1459.  In addition, prior to termination, West also consulted with the Commissioners regarding her rights as a permanent employee.  These actions establish that she received both notice and an opportunity to be heard.  For these reasons, we affirm the district court's decision that West received an adequate pretermination hearing.

967 F.2d at 368 (footnote omitted).

The Court finds that the Plaintiffs were entitled to pre-termination hearings.  The parties do not dispute that the RIF at issue in this case was a bona-fide RIF.  The Court thus must decide whether the reorganization exception applies, under which the "due process clause may not require a pre-termination hearing when a termination is the result of a bona fide reduction in force."  West

v. Grand County, 967 F.2d at 367.  The Tenth Circuit has not adopted the reorganization exception.

See Theis v. Denver Bd. of Water Comm'rs, 149 F.3d 1191, at *2; West v. Grand County, 967 F.2d

at 367.  In West v. Grand County, the Tenth Circuit apparently took the considerations that other

courts used in stating that the due-process clause may not require a pre-termination hearing when

the termination is the result of a bona-fide RIF and enumerated them as factors which may inform

a determination whether a pre-termination hearing is required when the termination was a result of

a RIF.  The Tenth Circuit listed three factors that "militate against the need for a pre-termination

hearing in [circumstances involving a bona fide RIF]:" (i) when the terminations "are not

stigmatizing;" (ii) when "job performance is not particularly relevant;" and (iii) when

"pretermination hearings may be impractical."  West v. Grand County, 967 F.2d at 367. In West v.

Grand County, the Tenth Circuit declined to "speculate whether a pretermination hearing would be

required in such circumstances," because the case before it did not present these factors, given that,

in the case before it, the plaintiff alleged the RIF, which was directed only at her, was "actually a

subterfuge designed to terminate her without establishing the required cause."  967 F.2d at 367.

Because the Tenth Circuit set forth factors regarding whether a pre-termination hearing in

circumstances involving a bona-fide RIF is necessary, the Court will use these factors to determine

whether the Plaintiffs were entitled to pre-termination hearings.  Furthermore, these factors appear

to align with the reasons why other circuits have applied a reorganization exception when there is

no dispute the RIF was bona fide.  See Whalen v. Mass, Trial Court, 397 F.3d 19, 25 (1st Cir.

2005)(stating that, when the termination is in good faith directed at positions rather than individuals,

a hearing loses its relevance, and that, additionally, because reorganizations often affect numerous

employees, the governmental interest in efficient administration weighs heavily).

       The Court finds that Valenzuela, Pino, and Mascarenas were entitled to pre-termination

hearings.  The first factor-- whether the terminations were stigmatizing -- weighs in Valenzuela's, Pino's and Mascarenas' favor.  They state that, "because DOC and CYFD offered employment based on perceived qualifications and background, [their] non-selection was embarrassing and damaging to [their] reputation[s] in the community."  E.g., Richard Trujillo's Answers to Defendants' First Set of Interrogatories Answer to Interrogatory No. 7, filed February 22, 2011 (Doc. 58-11).  See Response at 16 ("All plaintiffs provided a similar response.").[20]  Given the "small number of employees" who faced separation from their employment, and the evidence that Valenzuela's, Pino's, and Mascarenas' separations were embarrassing to them and damaging to their reputations in the community, this factor weighs in favor of pre-termination hearings for Valenzuela, Pino, and Mascarenas.  See West v. Grand County, 967 F.2d at 367-68.

The second factor -- whether job performance was particularly relevant in Valenzuela's, Pino's, and Mascarenas' terminations -- weighs in Valenzuela's, Pino's, and Mascarenas' favor. The undisputed facts show that Valenzuela was not separated from his employment based on work performance, but there is evidence that his separation was a result of his lack of a high school diploma -- his work qualifications.  See Perez Aff. 18, at 4; Ojinaga Memo. at 1.  Pino was not separated from his employment based on work performance, but there is evidence that his was the target of retaliation in his separation -- he was terminated from his employment based on allegations of misconduct, reinstated after the Eighth Judicial District Court found that his discharge was

---

[20] Although the Plaintiffs did not place each of their answers to Interrogatory No. 7 in the record, their Response states that they each provided a similar response.  The Defendants did not dispute that each Plaintiff provided a similar response and, at the hearing, argued only that the Plaintiffs did not face stigma, because the entire school closed.  This response, however, does not controvert the Plaintiffs' assertion that they were not selected for other positions, and that this non-selection was embarrassing and damaging to their reputations in the small community.  The Court will therefore accept as undisputed that the Plaintiffs' non-selection was embarrassing to them and damaging to their reputations in the small community.

arbitrary and capricious, and contrary to law, and, when he was reinstated, he was shortly thereafter separated from his employment.  See Perez Aff. 18, at 4;Decision and Order at 1-2; Meeting Minutes at 1. Mascarenas was separated from his employment because of disciplinary reasons based on alleged misconduct. See Mascarenas Memorandum at 1; Dodson Electronic Mail Transmission at 1; Auten Electronic Mail Transmission at 1.   There are thus issues of fact regarding: (i) Valenzuela, where there is evidence that his separation was a result, at least in part, because of his job qualifications; (ii) Pino, where there is evidence that his separation was, a result, at least in part, of retaliation; and (iii) Mascarenas, where there is evidence that his separation was a result, at least in part, because of disciplinary reasons.  Because, taking the evidence in the light most favorable to the non-moving parties, there is evidence that Valenzuela, Pino, and Mascarenas were separated from their employment because of, at least in part, job performance, this factor weighs in favor of their entitlement to a pre-termination hearing.

The third factor --whether pre-termination hearings were impractical -- weighs in Valenzuela's, Pino's, and Mascarenas' favor.  Pre-termination hearings for the three employees were not impractical.  Perez, the State Personnel Director, drafted a written RIF plan to be presented to the State Personnel Board for its review, its acceptance, modification, or rejection.  See, e.g., Perez Aff. ¶ 11, at 3; Motion as to Sanchez ¶ 14, at 6 (setting forth this fact); Response at 4-8 (not controverting this fact).  The plan, if accepted, would affect 162 classified positions and eight employees.  See, e.g., Perez Aff. ¶ 11, at 3; Motion as to Sanchez ¶ 14, at 6 (setting forth this fact); Response at 4-8 (not controverting this fact).  Valenzuela, Pino, and Mascarenas were three of those eight employees.  Three pre-termination hearings is a very "small number," West v. Grand County, 967 F.2d at 367, unlike a situation in which "over one hundred" employees are separated, "for whom [one district court has said] it is impossible to have pre-termination hearings," Mayfield v. Kelly,

801 F. Supp. 795 (D.D.C. 1992).  This factor thus weighs in favor of pre-termination hearings for Valenzuela, Pino, and Mascarenas.

Because these three factors weigh in favor of pre-termination hearings for Valenzuela, Pino, and Mascarenas, the Court believes that Valenzuela, Pino, and Mascarenas were entitled to pre-termination hearings.  See West v. Grand County, 967 F.2d at 367 ("The following factors militate against the need for a pretermination hearing in such circumstances: such terminations are not stigmatizing, job performance is not particularly relevant, and pretermination hearings may be impractical.").

The Court also finds that Sanchez, Trujillo, Bustos, Gonzales, and Abreu were entitled to pre-termination hearings.  The first factor -- whether the terminations were stigmatizing -- weighs in their favor.  They allege that, "because DOC and CYFD offered employment based on perceived qualifications and background, [their] non-selection was embarrassing and damaging to [their] reputation[s] in the community."  E.g., Trujillo's Answers to Interrogatories, Interrogatory No. 7.  See Response at 16 ("All plaintiffs provided a similar response.").  Given the "small number of employees" facing separation from their employment, and the evidence that their separations were embarrassing to them and damaging to their reputations in the community, this factor weighs in favor of pre-termination hearings for Sanchez, Trujillo, Bustos, Gonzales, and Abreu.  See West v. Grand County, 967 F.2d at 367-68.

The second factor -- whether job performance was particularly relevant in Sanchez', Trujillo's, Bustos', Gonzales', and Abreu's terminations -- weighs in the Defendants' favor.  The undisputed facts show that Sanchez was not separated from his employment based on work performance.  See Perez Aff. ¶ 18, at 4.  Trujillo was not separated from his employment based on work performance.  See Perez Aff. 18, at 4.  Bustos was not separated from his employment based

on work performance.  See Perez Aff. 18, at 4.  Gonzales was not separated from his employment based on work performance.  See Perez Aff. 18, at 4.  Abreu was not separated from his employment based on work performance.  See Perez Aff. 18, at 4.  The undisputed facts thus show that job performance was not particularly relevant in Sanchez', Trujillo's, Bustos', Gonzales', and Abreu's terminations.  This factor thus weighs against a finding that Sanchez, Trujillo, Bustos, Gonzales, and Abreu are entitled to pre-termination hearings.

The third factor --whether pre-termination hearings were impractical -- weighs in Sanchez', Trujillo's, Bustos', Gonzales', and Abreu's favor.  Pre-termination hearings for the five employees were not impractical.  Perez, the State Personnel Director, drafted a written RIF plan to be presented to the State Personnel Board for its review, its acceptance, modification, or rejection.  See, e.g., Perez Aff. ¶ 11, at 3; Motion as to Sanchez ¶ 14, at 6 (setting forth this fact); Response at 4-8 (not controverting this fact).  The plan, if accepted, would affect 162 classified positions and eight employees.  See, e.g., Perez Aff. ¶ 11, at 3; Motion as to Sanchez ¶ 14, at 6 (setting forth this fact); Response at 4-8 (not controverting this fact).  Sanchez, Trujillo, Bustos, Gonzales, and Abreu were five of the eight employees.  Five pre-termination hearings is a very "small number," West v. Grand County, 967 F.2d at 367, unlike a situation in which "over one hundred" employees are separated, "for whom [one district court has said] it is impossible to have pre-termination hearings," Mayfield v. Kelly, 801 F. Supp. at 798.  This factor thus weighs in favor of pre-termination hearing for Sanchez, Trujillo, Bustos, Gonzales, and Abreu.

Because two of the three factors weigh in favor of pre-termination hearing for Sanchez, Trujillo, Bustos, Gonzales, and Abreu, the Court believes that Sanchez, Trujillo, Bustos, Gonzales, and Abreu were entitled to a pre-termination hearing.  See West v. Grand County, 967 F.2d at 367.

Although the Tenth Circuit in West v. Grand County did not specifically discuss whether

employees were entitled to post-termination hearings when they were terminated pursuant to a RIF, "[i]n general, a post-termination hearing is required."  Copelin-Brown v. N.M. State Pers. Office, 399 F.3d at 1255 (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 546-57 (stating that the "Due Process Clause requires provision of a hearing 'at a meaningful time'" after termination)).  The Court believes that the factors the Tenth Circuit discussed in West v. Grand County may be as helpful in determining whether an employee was entitled to a post-termination hearing as they are in determining whether an employee was entitled to a pre-termination hearing.  Using the factors that the Tenth Circuit discussed in West v. Grand County, the Court believes that Valenzuela, Pino, and Mascarenas were entitled to post-termination hearings, because all three factors weigh in favor of a post-termination hearing.  The Court also believes that Sanchez, Trujillo, Bustos, Gonzales, and Abreu were entitled to post-termination hearings, because two of the three factors the Tenth Circuit discussed in West v. Grand County weigh in favor of a post-termination hearing.  The Court thus finds that all the Plaintiffs were entitled to post-termination hearings.  See Copelin-Brown v. N.M. State Pers. Office, 399 F.3d at 1255; West v. Grand County, 967 F.2d at 367.

### D.    THE COURT FINDS THAT DODSON AND PEREZ ARE ENTITLED TO QUALIFIED IMMUNITY.

The Defendants assert that the individuals Defendants are entitled to qualified immunity, because there is no clearly established law in New Mexico requiring pre-termination or post-termination hearings in the context of a RIF.  Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  Qualified immunity "protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out

lawsuit.'" Roybal v. City of Albuquerque, No. Civ. 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 129 S. Ct. 808, 815 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 129 S. Ct. at 815 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden." Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001).  The plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged unlawful activity. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009); Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  In assessing whether the right was clearly established, the court asks whether the right was sufficiently clear that a reasonable officer in the defendant's shoes would understand that what he or she did violated that right. See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d at 1327.  In Saucier v. Katz, 533 U.S. 194 (2001), overruled in part by Pearson v. Callahan, the Supreme Court held that the court must decide whether there was a constitutional violation first before it decides whether the law is clearly established. See 533 U.S. at 200-01.  Courts are no longer required to analyze the issues in that order. See Pearson v. Callahan, 129 S. Ct. at 818.  "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment -- showing 'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" Nelson v. McMullen, 207 F.3d 1202, 1206 (10th Cir. 2000).

A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned." Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983), cert. denied, 469 U.S. 880 (1984). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Strepka v. Miller, 2001 WL 1475058, at * 5 (10th Cir. 2001)(citing Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). See Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). The Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. at 640. However, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." 483 U.S. at 635.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified-immunity defense. In Pearson v. Callahan, the Supreme Court held that, "while the sequence set forth [in Saucier v. Katz] is often appropriate, it should no longer be regarded as mandatory." 129 S. Ct. at 818. Rather, lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 129 S. Ct. at 818. The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz

would often be beneficial.  See Pearson v. Callahan, 129 S. Ct. at 819.  Once the plaintiff has established the inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City and County of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Court finds that the individual Defendants are entitled to qualified immunity, because there is no clearly established law requiring pre-termination or post-termination hearings in the context of a bona fide RIF.  The Plaintiffs rely on Copelin-Brown v. New Mexico State Personnel Office and West v. Grand County to argue that a reasonably prudent public official would understand that the challenged action violated their constitutional rights.[21]

In Copelin-Brown v. New Mexico State Personnel Office, the Tenth Circuit addressed whether the "district court erroneously found violations of the Due Process and Equal Protection Clauses, that the individual defendants are entitled to qualified immunity," and whether the district court "erroneously found a breach of contract."  399 F.3d at 1252.  The SPO employed Copelin-Brown for four years.  See 399 F.3d at 1252.  Copelin-Brown was initially hired as a receptionist, but was later reassigned to a different position that required more computer work; this work exacerbated her problems with migraine headaches.  See 399 F.3d at 1252.  " Over time, Ms. Copelin-Brown's condition worsened, and she became unable to perform the tasks her position required."  399 F.3d at 1252.  Copelin-Brown was informed that she would be fired if she could not perform, pursuant to NMAC 1.7.10.13, which applies only to employees who are physically or mentally unable to perform their jobs.  See 399 F.3d at 1252.  This regulation did not provide the

_____

[21] The Tenth Circuit had issued both West v. Grand County -- which the Tenth Circuit decided in 1992 -- and Copelin-Brown v. New Mexico State Personnel Office -- which the Tenth Circuit decided in 2005 -- at the time of the RIF in this case -- which occurred in 2006.

terminated employee with a right of appeal, but required the employer to make reasonable efforts

to find other suitable vacant positions and document all efforts to accommodate the employee's

medical restrictions.  See 399 F.3d at 1252.  Copelin-Brown filed suit, alleging, among other claims,

a breach of contract and a § 1983 claim.  See 399 F.3d at 1252.  The Tenth Circuit found that the

district court was correct in finding that the lack of procedural due process violated Copelin-Brown's

constitutional rights.  See 399 F.3d at 1255.  The Tenth Circuit stated:

> New Mexico law clearly states that employees that have completed a probationary period of one year may only be terminated for just cause.  N.M. Stat. Ann. § 10-9-18(F); Barreras v. State of N.M. Corrs. Dept., 133 N.M. 313, 62 P.3d 770, 775 (2002); N.M. Admin. Code tit. 1, § 7.11.10 (only non-disabled employees).
>
> . . . .
>
> These restrictions on the government's ability to terminate are sufficient to create a property interest in Ms. Copelin-Brown. Hennigh[ v. City of Shawnee], 155 F.3d [1249,] 1253-54 [(10th Cir. 1998)].  Moreover, to accept the government's contrary argument would be to allow the government, at any time, to unilaterally declare an employee disabled and terminate that employee without a hearing, thus avoiding due process protections.
>
> . . . .
>
> In this case, Ms. Copelin-Brown challenges only the efficacy of the post-termination process.  To evaluate the constitutionality of post-termination process, we must view it in light of the pre-termination procedures it follows. Where, as here, the pre-termination process offers minimal opportunity for the employee to present her side of the case, the procedures in the post-termination hearing become much more important. Benavidez[ v. City of Albuquerque], 101 F.3d [620,] 626 [(1996)].  "Such a post-termination hearing represents the only meaningful opportunity the employee has to challenge the employer's action . . . ." Id.  In the instant case, Ms. Copelin-Brown, under N.M. Admin. Code tit. 1, § 7.10.11, was afforded no post-termination hearing or opportunity to appeal the SPO's decision to terminate her.

399 F.3d at 1254-55.  In Copelin-Brown v. New Mexico State Personnel Office, the Tenth Circuit

did not address a bona fide RIF or whether pre-termination hearings were required before employees

were separated from their employment as the result of a bona fide RIF; the Court thus cannot say

that this decision clearly established that employees were entitled to pre-termination or post-termination hearings in the context of a bona fide RIF, see Medina v. City and County of Denver, 960 F.2d at 1498, especially given that other courts have not required pre- or post-termination hearings in the bona-fide RIF context, see, e.g., Wash. Teachers' Union Local No. 6, Am. Federation of Teachers, AFL-CIO v. Bd. of Educ. of the Dist. of Columbia, 109 F.3d at 781 (stating that, "[b]alancing the Mathews factors and taking account of the availability of post-termination relief, we hold that due process did not require pre-termination proceedings before the 1996 RIF," and that "[t]he District's need to cut expenditures quickly and efficiently outweighed teachers' interests, especially in light of the minimal risk of error in the ranking process and the questionable value of pre-termination proceedings"); Praprotnik v. City of St. Louis, 798 F.2d 1168 (8th Cir. 1986)("In the ordinary, budgetary lay-off situation, however, individual pre-lay-off hearings are not necessary given the impracticality of imposing such a requirement."), rev'd on other grounds, 485 U.S. 112 (1988); Mayfield v. Kelly, 801 F. Supp. at 798 ("Pre-termination hearings are for these reasons not required in RIF terminations. . . .  A RIF clearly does not raise the same due process concerns that are raised by for-cause dismissals.").

     In West v. Grand County, the Tenth Circuit recognized that several circuits have suggested "that the due process clause may not require a pretermination hearing when a termination is the result of a bona fide reduction in force."  967 F.2d at 367.  The Tenth Circuit listed factors that "militate[d] against the need for a pretermination hearing in [circumstances of a bona fide RIF]."  967 F.2d at 367.  The Tenth Circuit stated, however, that the case before it did not present such a scenarios, because, in the case before it, the RIF was directed "specifically just at West, and West alleged that the reduction was actually just a subterfuge designed to terminate her without establishing the required cause."  967 F.2d at 367.  The Tenth Circuit thus stated that it "need not

speculate whether a pretermination hearing would be required in such circumstances," that is,

circumstances involving an undisputed bona-fide RIF. The Tenth Circuit analogized the case before

it to a case from the United States Court of Appeals for the Seventh Circuit, Misek v. City of

Chicago, 783 F.2d 98 (7th Cir. 1986), where the Seventh Circuit stated:

> [T]he plaintiffs assert that the reorganization was a sham and that their jobs were
> never abolished. Thus the plaintiffs have sufficiently alleged that they were fired for
> "cause" to afford them the protections of due process. To hold otherwise would
> allow government officials to cry "reorganization" in order to circumvent the
> constitutional and statutory protections guaranteed . . . .

West v. Grand County, 967 F.2d at 368 (citation omitted). The Tenth Circuit stated that it agreed

with the Seventh Circuit and that "[t]he fact that Grand County labeled West's discharge a [RIF]

does not affect her entitlement to a pretermination hearing when she is asserting that the [RIF] was

a sham aimed particularly at her." 967 F.2d at 368 (citation omitted).

> In his concurring opinion in Thompson v. District of Columbia, Judge Edwards stated:

> In West v. Grand County, 967 F.2d 362, 367 (10th Cir.1992), for example, the Tenth
> Circuit explained that it had "no doubts" that an employee alleging a pretextual RIF
> maintained her protected property interest, arguing that the very function of a hearing
> would be to determine whether or not the RIF had been legitimate. Labeling an
> employee's termination "a 'reduction in force' does not affect her entitlement to a
> pretermination hearing when she is asserting that the reduction in force was a sham
> aimed particularly at her." Id. at 368.

428 F.3d at 291 (Edwards, J., concurring).

The Court believes that it is clearly established that, when there is evidence that the RIF was

a sham or a subterfuge to eliminate an employee, the employee is entitled to a pre-termination

hearing. See Thompson v. District of Columbia, 428 F.3d at 291 (Edwards, J., concurring); West

v. Grand County, 967 F.2d at 368. In a situation involving a bona fide RIF, such as the situation in

this case, however, the Court does not believe that the law is clearly established that the Plaintiffs

were entitled to a pre-termination hearing. In West v. Grand County, the Tenth Circuit did "not

speculate whether a pretermination hearing would be required" when the "termination is the result of a bona fide [RIF]," because the case before it did not present a situation of a bona fide RIF. 967 F.2d at 368. Because the Tenth Circuit declined to "speculate" whether a pre-termination hearing would be required when the termination is the result of a bona-fide RIF, the Court cannot say that there was clearly established law requiring pre-termination hearings in the context of a bona fide RIF. Furthermore, in West v. Grand County, the Court did not discuss whether a post-termination hearing was required in the context of a bona-fide RIF. The Court thus finds that the individual Defendants are entitled to qualified immunity. See Zweibon v. Mitchell, 720 F.2d at 172-73 (stating that a clearly established right is generally defined as a right so thoroughly developed, and consistently recognized under the law of the jurisdiction, as to be "indisputable" and "unquestioned"). The Court will therefore grant summary judgment on the Plaintiffs' procedural due-process claims against the individual Defendants -- Perez and Dodson -- on the basis of qualified immunity. See Pearson v. Callahan, 129 S. Ct. at 815 (stating that qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known").

II.   **ALTHOUGH THE COURT BELIEVES THAT THERE ARE NOT ISSUES OF FACT ON THE PLAINTIFFS' BREACH-OF-CONTRACT CLAIMS, THE COURT NEED NOT RULE ON THE PLAINTIFFS' STATE-LAW CONTRACT CLAIMS, BECAUSE THE COURT WILL REMAND THE PLAINTIFFS' STATE-LAW CLAIMS TO STATE COURT.**

The Defendants argue that there is no contract law creating a reasonable expectation of continuing employment for employees subject to a RIF. They argue that, although the Personnel Rules may be deemed a contract under New Mexico law, the State complied with the requirements in the New Mexico Administrative Code relating to a RIF, and that the Court should not create new and additional requirements that are not explicitly stated in the rules. They also argue that the

allegation of a breach of contract for failing to adhere to mandatory RIF procedures is unfounded, because the mandatory procedures were followed, and that the Defendants should not be held in breach of a non-existent requirement.

The Plaintiffs argue that New Mexico law establishes that the personnel rules of a public employer is sufficiently promissory to create reasonable expectations of performance and be viewed as an enforceable contract of employment.  They argue that the Defendants breached the contract contained in "Board rules" by "failing to adhere to mandatory reduction in force procedures." Response at 13.  They argue that they construe the contract to require a written, Board-approved plan before the RIF can be initiated and that the Defendants' actions imply a different interpretation, suggesting ambiguity.  They argue that, to the extent an ambiguity exists, extrinsic evidence to assist in construing the contract is required.  The Plaintiffs further argue that a dispute exists with respect to a breach, because the Plaintiffs contend that the undisputed facts establish a breach while the Defendants suggest no breach occurred.

The Supreme Court of New Mexico has held that an implied contract of employment between a government employee and government employer may arise from writings that are sufficiently concrete in their representations -- such as an employee handbook or a personnel policy.  See Garcia v. Middle Rio Grande Conservancy Dist., 121 N.M. at 731-32, 918 P.2d at 11-12.  In Barreras v. State of New Mexico Corrections Department, the Court of Appeals of New Mexico recognized that the State Personnel Act, along with its attendant rules and regulations, have "attributes of an employ[ment] contract, because they control the employer-employee relationship and give rise to reasonable employee expectations."  Barreras v. State of N.M. Corrs. Dep't, 133 N.M. at 315, 62 P.3d at 772 (internal quotation marks and citation omitted).  The Court of Appeals stated that "the State Personnel Act and [its] attendant rules, regulations, and policies" create

-66-

"enforceable rights in state employees." Barreras v. State of N.M. Corrs. Dep't, 133 N.M. at 315, 62 P.2d at 772.

Even assuming that the State Personnel Administration's rules and regulations created an implied employment contract, the provisions in the New Mexico Administrative Code relating to a RIF may not be ambiguous, and the Plaintiffs may not have demonstrated a genuine issue of material fact whether the Defendants breached the implied contract. The Court need not, however, rule on the Plaintiffs' breach-of-contract claims, because it will remand these claims to state court.

The provisions relating to a RIF in the New Mexico Administrative Code are not ambiguous. "Generally, the goal of contract interpretation is to ascertain the intentions of the contracting parties." Gallegos v. Pueblo of Tesuque, 132 N.M. 207, 218, 46 P.3d 668, 679 (2002)(quoting Ponder v. State Farm Mut. Auto. Ins. Co., 129 N.M. 698, 702, 12 P.3d 960, 964 (2000))(internal quotation marks omitted); Strata Prod. Co. v. Mercury Exploration Co., 121 N.M. 622, 630, 916 P.2d 822, 830 (1996))). "The court's duty is confined to interpreting the contract that the parties made for themselves, and absent any ambiguity, the court may not alter or fabricate a new agreement for the parties." Gallegos v. Pueblo of Tesuque, 132 N.M. at 218-19, 46 P.3d at 679-80 (quoting Ponder v. State Farm Mut. Auto. Ins. Co., 129 N.M. at 702, 12 P.3d at 964; CC Housing Corp. v. Ryder Truck Rental, Inc., 106 N.M. 577, 579, 746 P.2d 1109, 1111 (1987))(alterations and internal quotation marks omitted). "Absent ambiguity, provisions of a contract need only be applied, rather than construed or interpreted." Richardson v. Farmers Ins. Co. of Am., 112 N.M. 73, 74, 811 P.2d 571, 572 (1991)(citing McKinney v. Davis, 84 N.M. 352, 503 P.2d 332 (1972)).

In New Mexico, a court may consider extrinsic evidence to determine "whether the meaning of a term or expression contained in the agreement is actually unclear." Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235 ("New Mexico law, then, allows the court to consider extrinsic

evidence to make a preliminary finding on the question of ambiguity."). In Mark V, Inc. v. Mellekas, the Supreme Court of New Mexico summarized the law in New Mexico concerning the interpretation of "ambiguous or unclear language in written agreements":

> An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity. C.R. Anthony [v. Loretto Mall Partners], 112 N.M. [504,] 509 n.2, 817 P.2d [817,] 243 n.2 [(1991)]. The question whether an agreement contains an ambiguity is a matter of law to be decided by the trial court. Levenson v. Mobley, 106 N.M. 399, 401, 744 P.2d 174, 176 (1987). The court may consider collateral evidence of the circumstances surrounding the execution of the agreement in determining whether the language of the agreement is unclear. C.R. Anthony, 112 N.M. at 508-09, 817 P.2d at 242-43. If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law. Id. at 510, 817 P.2d at 244. If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists. Vickers v. North Am. Land Dev., Inc., 94 N.M. 65, 68, 607 P.2d 603, 606 (1980). At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder, C.R. Anthony, 112 N.M. at 510, 817 P.2d at 244.
>
> Once the agreement is found to be ambiguous, the meaning to be assigned the unclear terms is a question of fact. Segura v. Molycorp, Inc., 97 N.M. 13, 18, 636 P.2d 284, 289 (1981). However, in the event the parties do not offer evidence of the facts and circumstances surrounding execution of the agreement and leading to conflicting interpretations as to its meaning, the court may resolve any ambiguity as a matter of law by interpreting the contract using accepted canons of contract construction and traditional rules of grammar and punctuation. C.R. Anthony, 112 N.M. at 510 n.5, 817 P.2d at 244 n.5. The factual issues, if any, presented by an ambiguity must be resolved by the jury (or by the judge as fact finder in the case of a bench trial) with the benefit of a full evidentiary hearing prior to deciding breach and damages. Id. at 510, 817 P.2d at 244. In order to determine the meaning of the ambiguous terms, the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent. American Bank of Commerce v. M & G Builders, Ltd., 92 N.M. 250, 252, 586 P.2d 1079, 1081 (1978). Evidence may be presented to the fact finder to aid in the interpretation of the agreement, but no evidence should be received when its purpose or effect is to contradict or vary the agreement's terms. Maine v. Garvin, 76 N.M. 546, 550-51, 417 P.2d 40, 43 (1966); see also C.R. Anthony, 112 N.M. at 509, 817 P.2d at 243.

114 N.M. at 781-82, 845 P.2d at 1235-36.

As this Court stated in <u>Great American Insurance Co. of New York v. W. States Fire Protection Co.</u>, 730 F. Supp. 2d 1308 (D.N.M. 2009)(Browning, J.):

> In <u>Mark V, Inc. v. Mellekas</u>, the Supreme Court of New Mexico summarized the circumstances under which it is appropriate for a district court to construe a contract as a matter of law, and when a district court should find that a contract is ambiguous and leave construction of the contract to a jury.  According to the Supreme Court of New Mexico in <u>Mark V, Inc. v. Mellekas</u>, a district court may take extrinsic evidence to determine whether a contract is ambiguous, and "if the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law.  If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists." <u>Id.</u>, 845 P.2d at 1235 (citations omitted).

730 F. Supp. 2d at 1314 n.1.

The Plaintiffs argue that the alleged contract is ambiguous, because they construe the contract to require a written, Board-approved plan before a RIF can be initiated, and because the Defendants' actions imply a different interpretation.  The Plaintiffs have not introduced extrinsic evidence to show that the alleged contract is ambiguous.  They instead appear to argue that the language of the New Mexico Administrative Code relating to a RIF is unclear, and is reasonably and fairly susceptible of different constructions.[22]

The New Mexico Administrative Code states that the objective of "Part 10 of Chapter 7 is: to provide a system for employee furlough, and separation upon reduction in force."  NMAC 1-7-10-6. The NMAC does not define reduction in force.  Regarding RIFs, the NMAC states:

---

[22] The Plaintiffs do not argue that the alleged contract is ambiguous based on Tenth Circuit cases stating that, when an employee has a property interest, a hearing is generally required.  <u>See</u> <u>Copelin-Brown v. N.M. State Pers. Office</u>, 399 F.3d at 1255 ("Once a protected property interest is established, the question then becomes what level of process is appropriate. In general, a post-termination hearing is required.").  They do not argue that this law creates an ambiguity, because the law makes the code fairly susceptible to different constructions.  Rather, the Plaintiffs argue only that there is an ambiguity based on the fact that the language in the New Mexico Administrative Code is subject to different interpretations.

**REDUCTION IN FORCE:**

A.      An agency may lay off employees only for deletion of positions, shortage of work or funds, or other reasons that do not reflect discredit on the services of the employees.

B.      An agency shall identify organizational units for purposes of a layoff and submit a written plan to the board.  Such organizational units may be recognized on the basis of geographic area, function, funding source, or other factors. The agency must define the classifications affected within the organizational unit.

C.      Upon board approval of a layoff plan, the agency effecting the layoff shall initiate a right of first refusal within the agency.  All employees affected by the layoff shall be provided the following rights:

(1)      employees to be affected by the reduction in force (RIF) shall be provided the right of first refusal to any position to be filled within the agency for which they meet the established requirements, at the same or lower midpoint than the midpoint of the position the employee currently holds, unless there is an actual layoff candidate exercising RIF rights for that position;

(2)      affected employees shall compete only with other employees in the same agency affected by the reduction in force;

(3)      the agency's list of eligible candidates for the open positions shall be comprised of those affected employees meeting the established requirements of the position;

(4)      employees shall have eleven calendar days from the date of an offer to accept the position unless otherwise agreed; employees who do not accept an offer shall not lose the right of first refusal status to other positions; and

(5)      the right of first refusal under Subsection C of 1.7.10.9. NMAC shall extend until the first effective date of layoff as defined in the plan.

D.      The order of layoff due to reduction in force shall be by service date which is determined based upon the agency hire date.  In the event of a tie, the director shall determine an appropriate mechanism for breaking the tie.

E.      No employee in career status shall be laid off while there are term, probationary, emergency or temporary status employees in the same classification in the same organizational unit.

> F.     Employees in career status shall be given at least 14 calendar days written notice of layoff.  Notice shall be served according to the provisions of 1.7.1.10 NMAC.

NMAC 1.7.10.9.  There is no express requirement stating when the State must submit a RIF plan. This lack of a requirement does not make NMAC 1.7.10.9 ambiguous.  NMAC 1.7.10.9 is not unclear or reasonably susceptible to different interpretations; instead, it allows the State to submit the plan to the State Personnel Board as early or late in the process as it wishes, see Mark V, Inc. v. Mellekas, 114 N.M. at 781-82, 845 P.2d at 1235-36, provided that, upon State Personnel Board approval of a RIF plan, the agency shall initiate a right of first refusal within the agency.  At the hearing, the Plaintiffs argued that the contract "if construed to make it sensible and to accomplish the purposes of the reduction in force regul[ations] require the Court to construe it in a way to mean that the defendants had an obligation to present that plan early on in the process." Tr. at 53:16-20 (Pennington).  The language of the regulation does not suggest such a requirement and the lack of such an explicit requirement does not suggest such a requirement.  The only requirement regarding time in the regulation is that employees in career status have at least fourteen calendar days written notice of layoff and that, upon the State Personnel Board's approval of the RIF plan, the agency shall initiate a right of first refusal within the agency.  The other provisions in the regulation do not make the regulation reasonably susceptible to this interpretation -- the provisions state only that an agency shall submit a written plan and that, upon board approval of the plan, the agency shall initiate a right of first refusal within the agency.  The language of the regulation does not lead to a reasonable interpretation that an agency must submit a plan when they first plan to implement a RIF. The Plaintiffs argue that the regulation does not make any sense if it does not require a written plan when an agency first plans to implement a RIF.  The language, however, does set forth this requirement.  Because the language allows an agency to submit a written plan as early or late in the

-71-

process as it wishes, it is not reasonably susceptible to two interpretations -- an interpretation that an agency may submit a written plan at any time in the process and an interpretation that an agency must submit a written plan when it first begins to contemplate a RIF.  The Court thus believes that, as a matter of law, that NMAC 1.7.10.9B is not ambiguous.[23]  The Court need not, however, rule on this issue, because it will remand the Plaintiffs' state-law claims to state court.

There may not be a genuine issue of material fact whether the Defendants breached the implied contract.  The elements of a breach-of-contract action are the existence of a contract, breach of the contract, causation, and damages.  See Camino Real Mobile Home Park P'ship v. Wolfe, 119 N.M. 436, 442, 891 P.2d 1190, 1196 (1995).  NMAC 1.7.10.9 states: "An agency shall identify organizational units for purposes of a layoff and submit a written plan to the board."  NMAC 1.7.10.9B.  Perez, the State Personnel Director, drafted a written RIF plan to be presented to the State Personnel Board for its review, acceptance, modification, or rejection.  See, e.g., Perez Aff. ¶ 11, at 3; Motion as to Sanchez ¶ 14, at 6 (setting forth this fact); Response at 4-8 (not controverting this fact).  The plan, if accepted, would affect 162 classified positions and eight employees.  See, e.g., Perez Aff. ¶ 11, at 3; Motion as to Sanchez ¶ 14, at 6 (setting forth this fact); Response at 4-8 (not controverting this fact).  The RIF plan was to be presented to the State Personnel Board at its December 18, 2006 meeting.  See, e.g., Perez Aff. ¶ 14, at 3; Motion as to Sanchez ¶ 15, at 6 (setting forth this fact); Response at 4-8 (not controverting this fact).  The agenda that was initially posted on December 7, 2006 failed to list the RIF as an item to be considered.  See, e.g., Perez Aff. ¶ 12, at 3; Motion as to Sanchez ¶ 16, at 6 (setting forth this fact); Response at 4-8 (not controverting this

---

[23] Also, the Plaintiffs did not ask for a Mark V hearing or point to any extrinsic evidence it would submit at a Mark V hearing.  There is no indication that, at a Mark V hearing, the Court would have anything different to interpret the implied contract that it has now.

fact).  The agenda was revised on December 15, 2006 to include the RIF.  See, e.g., Perez Aff. ¶ 13, at 3; Motion as to Sanchez ¶ 17, at 6 (setting forth this fact); Response at 4-8 (not controverting this fact).  At its December 18, 2006 meeting, the State Personnel Board adopted the RIF by unanimous voice vote.  See, e.g., Perez Aff. ¶ 14, at 3; Motion as to Sanchez ¶ 18, at 6 (setting forth this fact); Response at 4-8 (not controverting this fact).  The eight employees were given letters notifying them that their positions no longer existed and informing them of their rights, which included six months of re-employment rights under the State Personnel Board Rules and the Personnel Act.  See, e.g., Perez Aff. ¶¶ 15-16, at 3; Motion as to Sanchez ¶ 19, at 6 (setting forth this fact); Response at 4-8 (not controverting this fact).  The Plaintiffs received at least fourteen calendar-days notice of layoff. See, e.g., Notice of Reduction in Force (dated December 19, 2006), filed February 22, 2011 (Doc. 58-4); Letter from E. Justin Pennington to Sandra Perez (dated January 31, 2007), filed February 22, 2011 (Doc. 58-5)(stating that the effective date of termination for the Plaintiffs was January 2, 2007).

The undisputed material facts may show that the Defendants complied with the requirements of NMAC 1.7.10.9.  The Defendants submitted a written RIF plan, which was approved.  The Plaintiffs received fourteen calendar-days notice of the layoff.  The Plaintiffs' argument relies on the Court reading a requirement into the NMAC which may be absent -- that the agency submit the plan before initiating the RIF.  The Court need not, however, rule on the Plaintiffs' breach-of-contract claims, because it will remand those claims to state court.

**III.    THE COURT ENTER DECLARATORY JUDGMENT IN THE PLAINTIFFS' FAVOR THAT THEY WERE ENTITLED TO PRE AND POST-TERMINATION HEARINGS, BUT WILL REMAND THE PLAINTIFFS' CLAIM FOR DECLARATORY JUDGMENT ON STATE-LAW ISSUES TO STATE COURT.**

The Declaratory Judgment Act states:

> In a case of actual controversy within its jurisdiction . . . any court of the United
> States, upon the filing of an appropriate pleading, may declare the rights and other
> legal relations of any interested party seeking such declaration, whether or not
> further relief is or could be sought. Any such declaration shall have the force and
> effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). "By the Declaratory Judgment Act, Congress sought to place a remedial arrow

in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of

relief to qualifying litigants."   Wilton v. Seven Falls Co., 515 U.S. 277, 288 (1995).   In their

Complaint, the Plaintiffs seek declaratory judgment regarding their rights.   In addressing the merits

of the Plaintiffs' procedural due-process claims, the Court discussed the Plaintiffs' entitlement to

pre- and post-termination hearings.   Because the Court found that the Plaintiffs were entitled to pre-

and post-termination hearings, the Court will enter declaratory judgment in the Plaintiffs favor on

the issues of their entitlement to pre- and post-termination hearings.   The Court will remand the

Plaintiffs' request for declaratory judgment on the state-law issues to state court.

   **IT IS ORDERED** that: (i) the Motion for Summary Judgment as to Antonio Sanchez, filed

January 31, 2011 (Doc. 49), is granted in part and denied in part; (ii) the Motion for Summary

Judgment as to Robert Valenzuela, filed January 31, 2011 (Doc. 50), is granted in part and denied

in part; (iii) the Motion for Summary Judgment as to Richard Trujillo, filed January 31, 2011 (Doc.

51), is granted in part and denied in part; (iv) the Motion for Summary Judgment as to Albert Pino,

filed January 31, 2011 (Doc. 52), is granted in part and denied in part; (v) the Motion for Summary

Judgment as to Tom Mascarenas, filed January 31, 2011 (Doc. 53), is granted in part and denied in

part; (vi) the Motion for Summary Judgment as to Joe Bustos, filed January 31, 2011 (Doc. 54), is

granted in part and denied in part; (vii) the Motion for Summary Judgment as to Richard Gonzales,

filed January 31, 2011 (Doc. 55), is granted in part and denied in part; and (viii) the Motion for

Summary Judgment as to Edward Abreu, filed January 31, 2011 (Doc. 56), is granted in part and

denied in part.  The Court will grant summary judgment on the Plaintiffs' procedural due-process claims against Defendant Dorian Dodson and Defendant Sandra Perez on the grounds of qualified immunity, because there is no clearly established law requiring pre-termination or post-termination hearings in the context of a bona-fide reduction in force.  The Court will enter declaratory judgment in the Plaintiffs' favor on the Plaintiffs' request for declaratory judgment on the federal law issues regarding their entitlement to pre- and post-termination hearings.  Having disposed of the Plaintiffs' federal claims, the Court remands the Plaintiffs' remaining state-law claims -- their breach-of-contract claims and their request for declaratory relief on state-law issues -- to the Eighth Judicial District Court, Colfax County, State of New Mexico.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

E. Justin Pennington
Law Offices of E. Justin Pennington
Albuquerque, New Mexico

   *Attorneys for the Plaintiffs*

Mark A. Basham
Peter Dwyer
Basham and Basham, P.C.
Santa Fe, New Mexico

   *Attorneys for the Defendants*